NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0383n.06

No. 14-1643

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
May 28, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| RICK BONDS, | ) | |
| | ) | |
|     Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| PHILIPS ELECTRONICS NORTH | ) | EASTERN DISTRICT OF MICHIGAN |
| AMERICA, et al., | ) | |
| | ) | |
|     Defendants-Appellees. | ) | |
| | ) | |

BEFORE:    DAUGHTREY, MOORE, and CLAY, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.   Plaintiff Rick Bonds, a long-time employee of defendant Philips Electronics North America Corporation, undertook a second full-time job with Philips's competitor, Barrington Medical Imaging, LLC, purportedly to help finance "future expenses of college and cars for [his] children."   Unfortunately, as a result of non-compete and confidentiality agreements that Bonds had signed with both of his employers, he was terminated from both jobs because of potential conflicts of interest that could arise from holding the two positions simultaneously.   In this litigation, Bonds does not contest Philips's decision to end his employment but, convinced that Philips also pressured Barrington into firing him, Bonds filed suit against Philips alleging a Michigan state-law claim of tortious interference with a business relationship.   The district court granted summary judgment to Philips, and Bonds now appeals, contending that the decision was improper and that the district court erred in

excluding certain proffered deposition testimony as inadmissible hearsay evidence. We find no merit to either contention and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Rick Bonds was originally hired in 1996 by Picker International, Inc., the predecessor-in-interest to Philips, as a field service technician/field service engineer to install, service, and maintain the company's x-ray equipment. Over time, Bonds completed training that also qualified him to service computed-tomography scanners, magnetic-resonance-imaging equipment, nuclear-medicine machinery, and other complex medical hardware.

Upon commencement of his employment with Picker, Bonds signed a "service engineer confidentiality agreement" and an "employee invention and confidential information agreement," both of which inured to the benefit not only of Picker, but also to the benefit of Picker's successors and assigns. In the first contract, Bonds promised "that for a period of one (1) year from the date of termination of [his] employment with PICKER INTERNATIONAL, [he would] not directly or indirectly service any PICKER INTERNATIONAL equipment that [he] did in fact service at any location to which [he] was assigned" while employed by Picker. Pursuant to the terms of the second contract, Bonds agreed that he would "not, without Picker's written consent, disclose or use at any time, either during or after [his] employment, any secret or confidential information relating to Picker's business unless required by the discharge of [his] duties to Picker."

In the succeeding years, Picker changed its name, was acquired by Royal Philips Electronics, and became known as Philips Medical Systems, a business unit of Philips Electronics North America. Throughout all of those changes, Bonds continued to perform his job as a service engineer and, in that position, had access to certain confidential information of

the company. Then, in January 2009, while still employed by Philips but without the knowledge of any Philips official, Bonds began working full-time as a field service engineer for Barrington Medical Imaging, LLC, a Philips competitor. To indicate his acceptance of Barrington's job offer to him, Bonds faxed to Barrington his signed assent to the terms and conditions of employment, including his understanding that he would "receive additional training on Siemens, GE and Philips CT and MRI scanners." Nevertheless, Mike Mercer, Barrington's vice-president of service operations, e-mailed Bonds earlier that very day, confirming with Bonds that "per our conversation, your only need is for Siemens and GE equipment."

Barrington's offer letter—one that required Bonds's signature to indicate his acceptance of the terms contained therein—also contained a "non-competition" provision. According to a document provided by Bonds during discovery, that provision read:

> You hereby warrant that, in entering into this agreement with BMI, you are in no manner in violation of a previous contract with respect to a non-compete clause, nor that you are under any contract with another company, *with the exception of your current contract agreement with Philips Medical Systems*, person or entity, which might conflict with the BMI businesses. (Emphasis added.)

However, another version of that same document omits the crucial language italicized above. In all other respects, the two versions of the agreement are identical, except that the version *without* the italicized language also contains time and date stamps from the Office Depot location from which Bonds claims to have faxed his acceptance to Barrington, accompanied by a cover sheet indicating that Bonds requested that the document (without the italicized language) be faxed to Mike Mercer at Barrington.[1]

---

[1] A declaration offered by William Yovic, part-owner of Barrington, casts doubt on the legitimacy of the version of the offer letter that recognized Bonds's dual employment with Barrington and Philips. Yovic asserted that he was unaware of Bonds's employment at Philips and "did not condone the simultaneous employment." Furthermore, Yovic stated that he was aware of no one at Barrington who knew of or condoned the simultaneous employment and that "Barrington would not have permitted Mr. Bonds's dual employment had it known."

For six months, beginning in January 2009 and continuing into July 2009, Bonds maintained full-time employment both at Philips and at Barrington, all the while keeping information concerning his job with Barrington a secret from Philips. Barrington officials later claimed that they also were unaware that Bonds had maintained his relationship with Philips after accepting the Barrington job offer. In fact, Mercer, the Barrington vice-president of service operations with whom Bonds interviewed and negotiated the employment terms, later declared under penalty of perjury, "At or near the time Barrington hired Mr. Bonds, he informed me that he gave his notice of resignation to Philips. I was not aware that Mr. Bonds kept his job with Philips while he worked for Barrington." Indeed, he maintained that Barrington would not have condoned such dual employment because "Barrington hired Mr. Bonds to work on Barrington accounts by servicing CT and MRI equipment for Barrington customers, including but not limited to, Philips brand equipment."

In July 2009, Bonds's secret came to light after a customer informed Philips that Bonds was apparently working for Barrington as well. When, at a July 16, 2009, meeting, Bonds admitted that he had worked at Barrington since January 2009, Philips terminated Bonds's employment with the company immediately, citing his violation of Philips's conflict-of-interest policy.

On August 19, 2009, Gerald Whitcomb, Philips's senior legal counsel, sent a letter to Bonds, with a facsimile copy forwarded to Barrington. In the body of that correspondence, Whitcomb stated:

> I am writing to remind you of your continuing obligation to Philips Healthcare, ("Philips") pursuant to the agreements you signed. As successor in interest to Picker, Philips is entitled to enforce these agreements against you, if necessary. A copy of the Service Engineer Confidentiality Agreement and the Employee Invention and Confidential Information Agreement are enclosed for your reference. Under these Agreements, you are precluded from disclosing Philips

confidential information, including but not limited to customer and pricing information.

We understand that you have been and are now employed by Barrington Medical. As you were employed by both companies simultaneously, from January until July of this year, we are naturally concerned about the potential disclosure of Philips confidential information. Please confirm in writing that you have not furnished Barrington with any such information. By copy of this letter, we are also asking Barrington Medical to confirm in writing that: 1) you have not provided Philips confidential information to Barrington Medical; and 2) that if you have, it will be returned immediately. Please send the confirmations to my attention.

Your conduct since your termination is equally concerning. We understand that you contacted Philips RTAC on August 17th and attempted to use your RTAC Pin to obtain Tier 2 support for Universal Imaging in Dearborn, Michigan. In attempting to use Philips resources in furtherance of your work at Barrington or otherwise, you are violating the above agreements.

After receiving the correspondence from Philips, Barrington responded by taking prompt action of its own, firing Bonds from his position with that company as well. On August 25, 2009, only six days after the date of Whitcomb's letter, Barrington vice-president Mercer wrote to Bonds:

I'm sorry that your employment with Barrington didn't work out as agreed. I hope you understand that the threat of a lawsuit that Philips may place upon us is too costly if we were to keep you employed. I wish it had worked out differently. You will soon receive information on any reimbursements, expenses, and your last paycheck in the weeks to follow.

Two weeks later, Bonds did receive an official notice of termination from co-owner Yovic, stating that the plaintiff's "employment with Barrington Medical Imaging, LLC, has been terminated for cause as of August 24, 2009." According to Yovic, that "cause" was the fact "that Mr. Bonds violated the terms of Mr. Bonds's agreement with Barrington and Barrington's policies by working for two companies at once." He explained further that "Barrington also considered Mr. Bonds's dual employment to be double dipping, which is not the standard in the medical imaging equipment sales and service industry. Barrington terminated Mr. Bonds's

employment solely for those reasons and not because of any threat from Philips." Additionally, on November 3, 2009, Mercer returned to Philips two computer discs found in Barrington's possession that contained "sensitive, proprietary, confidential, trade secret information materials and intellectual property belonging to Philips."

In filing this lawsuit, Bonds invoked the diversity jurisdiction of the federal courts in an attempt to correct what he alleged to be a wrong perpetrated against him. As stated previously, Bonds's complaint did not challenge Philips's decision to fire him. Nor did he seek compensation from Barrington for that company's employment decision. Instead, Bonds contended only that Philips should be held liable for tortious interference with his employment relationship with Barrington. According to Bonds, Philips "knew or should have known that the faxing of [the August 19 letter to Barrington] would interfere with plaintiff's employment contract with Barrington."

After answering Bonds's complaint, Philips counterclaimed against Bonds, alleging breaches of the two signed agreements that Bonds had entered into with the company and misappropriation of trade secrets. Then, following a period of discovery, Philips filed for summary judgment in its favor, both on Bonds's claims and on its own counterclaims.

The district court granted summary judgment to Philips on Bonds's state-law claim. In doing so, the district court determined that Bonds offered no admissible evidence that the Philips acted unjustifiably and maliciously for the purpose of interfering with a business relationship. Bonds did assert that Mike Mercer told him that he was being terminated not because he was working two jobs—a situation of which Bonds claims Barrington was aware—but because Philips had threatened Barrington with a lawsuit, so "[w]e had to let you go, we can't afford it." If admissible, such a threat could have created a dispute of material fact regarding Philips's

purpose in contacting Barrington. As recognized by the district court, however, "courts must disregard hearsay used to counter a motion for summary judgment." "Without these statements, Plaintiff has no evidence that Defendant maliciously and unjustifiably interfered with Plaintiff's employment of Barrington." In any event, the district court concluded, any actions by Philips in contacting Barrington could not be considered improper because they were undertaken for legitimate business reasons, that is, to protect confidential, proprietary information.

In light of the grant of summary judgment against Bonds, Philips moved to dismiss its counterclaims against him. The district court acquiesced in that request and entered a final judgment of dismissal. In his appeal to this court, Bonds challenges both the propriety of the grant of summary judgment to Philips and the correctness of the district court's refusal to regard Mercer's comments about Philips's threats of litigation as creating a genuine dispute of material fact.

## DISCUSSION

### Grant of Summary Judgment to Philips

We review *de novo* a district court's grant of summary judgment. *See Dodd v. Donahoe*, 715 F.3d 151, 155 (6th Cir. 2013). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). A non-moving party cannot withstand summary judgment, however, by introduction of a "mere scintilla" of evidence in its favor. *Id.*

In asserting its authority to adjudicate this dispute, the district court invoked the powers accorded it under the diversity-jurisdiction provisions of 28 U.S.C. § 1332. In such cases, federal courts must apply the substantive law of the forum state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). When doing so, we "must follow the decisions of the state's highest court when that court has addressed the relevant issue." *Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 326 (6th Cir. 2000). "If the issue has not been decided, a federal court must anticipate how the relevant state's highest court would rule and may rely on the state's intermediate appellate court decisions, along with other persuasive authority, in making this determination." *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013) (internal quotation marks and citations omitted).

The Michigan Supreme Court has identified four elements of a claim of tortious interference with a business relationship: "[1] the existence of a valid business relationship . . . [2] knowledge of the relationship . . . on the part of the defendant, [3] an intentional interference by the defendant inducing or causing a breach or termination of the relationship . . ., and [4] resultant damage to the plaintiff." *Cedroni Assocs., Inc. v. Tomblinson, Harburn Assocs., Architects & Planners, Inc.*, 821 N.W.2d 1, 3 (Mich. 2012) (internal quotation marks and citations omitted). The parties agree that Bonds has shown both that he had a valid business relationship with Barrington and that Philips was aware, or became aware, of that relationship. Although Philips does not concede that Bonds has suffered any damages as a result of the defendant's actions, both Bonds and Philips focus their arguments on the third element, *i.e.*, whether Philips intentionally interfered with the Bonds-Barrington relationship in such a manner as to cause the termination of Bonds's employment with Barrington.

To establish that element of a claim of tortious interference with a business relationship, "a plaintiff must demonstrate that the defendant acted both intentionally and either improperly or without justification." *Dalley v. Dykema Gossett PLLC*, 788 N.W.2d 679, 696 (Mich. Ct. App. 2010) (citation omitted). "The improper interference can be shown either by proving (1) the intentional doing of an act wrongful per se, or (2) the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading [plaintiff's] . . . business relationship." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 670 N.W.2d 569, 580 (Mich. Ct. App. 2003) (internal quotation marks and citation omitted), *aff'd*, 693 N.W.2d 358 (Mich. 2005).

"A 'per se wrongful act' is an act that is inherently wrongful or one that is never justified under any circumstances." *Formall, Inc. v. Cmty. Nat'l Bank of Pontiac*, 421 N.W.2d 289, 293 (Mich. Ct. App. 1988). Bonds does not assert that Philips committed any such *per se* wrongful act in this matter. Consequently, to succeed on his claim, Bonds must establish that some conduct by Philips both lacked justification and demonstrated malice. In other words, he must allege that the defendant "did something illegal, unethical or fraudulent." *Dalley*, 788 N.W.2d at 696 (citation omitted).

In an effort to satisfy that burden, Bonds maintains that Whitcomb's August 19 letter sent to Bonds and to Barrington provides the necessary proof of malice. Specifically, he notes that the letter, although addressed to Bonds, was copied to Barrington and incorporated a request to Barrington to return all of Philips's confidential information in Barrington's possession. Bonds sees this request as a veiled threat to sue Barrington unless it terminated Bonds's employment. He further asserts that the letter's implication that he had attempted on August 17 to access confidential information in Philips's possession was made without any proof of wrongdoing and

was sent to Barrington only "because it would and did infringe upon Bonds['s] right to continued employment without justification or cause."

Other than Bonds's bald assertions, however, there is no evidence in the record to support the conclusion that Philips's actions were malicious or without justification. In fact, Michigan courts consistently have recognized that "[w]here the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *BPS Clinical Labs. v. Blue Cross & Blue Shield of Mich.*, 552 N.W.2d 919, 925 (citation omitted). "Further, under Michigan law, preventing the anticompetitive use of confidential information is a legitimate business interest." *Rooyakker & Sitz, PLLC v. Plante & Moran, PLLC*, 742 N.W.2d 409, 418 (Mich. Ct. App. 2007) (internal quotation marks and citation omitted).

Despite any claims by Bonds to the contrary, the evidence considered by the district court did not constitute threats of litigation by Philips against Barrington. Instead, the missive sent by Whitcomb clearly expresses only Philips's concern "about the potential disclosure of Philips confidential information," and simply asks both Bonds and Barrington to confirm that no such information had been provided to Philips's competitor. The fact that Barrington did indeed possess two discs containing proprietary information that were eventually returned to Philips underscores the legitimacy of Philips's business concerns. Because the Whitcomb letter cannot reasonably be construed to threaten Barrington with litigation, the district court appropriately concluded that Bonds failed to show a genuine dispute of material fact regarding the establishment of an essential element of his tortious-interference claim.

## Exclusion of Purported Statement by Mercer to Bonds

Bonds next contends that oral and written statements made by Mercer to Bonds should have been viewed by the district court as creating a genuine dispute of fact over Philips's motivation in sending the letter to Bonds and to Barrington, thus precluding summary judgment in Philips's favor on the claim of tortious interference. Philips responds that the district court properly excluded the contested evidence from consideration because the oral statement in question was inadmissible hearsay that could not be presented in an admissible form at trial, and because the written statement cannot be interpreted logically in the manner Bonds proposed.

During his deposition testimony, Bonds claimed that he had a conversation with Mercer shortly after receiving the Whitcomb letter. According to Bonds, Mercer admitted at that time "that Phillips [sic] threatened him with a lawsuit" and that, as a result, Barrington was forced to terminate Bonds's employment with the company. But because Bonds never saw fit to depose Mercer during the period set aside for pretrial discovery, the only evidence of that statement is Bonds's own claim of what was said. Moreover, he sought to have the district court consider the statement for the truth of the matter asserted therein—classic hearsay evidence that could not be used to defeat an otherwise proper motion for summary judgment. In addition, declarations made by Mercer and by Yovic under penalty of perjury directly contradict the assertion that Mercer perceived Philips as exerting pressure upon Barrington to fire Bonds. Both men declared, using identical language, as follows:

> To my knowledge, no one from Philips requested that Barrington terminate Mr. Bonds's employment.

> To my knowledge, at no time did anyone from Philips threaten a lawsuit against Barrington in connection with Mr. Bonds's employment or conduct. No one from Philips made any other threat against Barrington as a result of Barrington's employment of Mr. Bonds.

Not to be stymied by rules of evidence, Bonds also argues on appeal that the district court need not rely on Mercer's *oral statement* to create a genuine dispute of fact because Mercer also sent Bonds a *written correspondence* conveying the same sentiment. Examination of the document that purportedly creates the necessary factual dispute does not, however, say what Bonds reads it to say. As quoted previously in pertinent part, Mercer's written note to Bonds said only, "I'm sorry that your employment with Barrington didn't work out as agreed. I hope you understand that the threat of a lawsuit that Philips may place upon us is too costly if we were to keep you employed." As written, that correspondence never states, nor even insinuates, that Philips actually threatened Barrington with a lawsuit. The letter merely conveys Mercer's own subjective interpretation of what *could* ensue should Bonds continue to be employed by Barrington. Viewed in conjunction with the statements made by Mercer in his declaration, Bonds's strained construction of Mercer's letter was entitled to no consideration whatever.

## CONCLUSION

For the reasons set out above, we AFFIRM the judgment of the district court.