NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0449n.06

Case No. 18-1997

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNION COMMERCIAL SERVICES LIMITED, | ) ) ) | **FILED** Aug 26, 2019 DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR |
| v. | ) ) | THE EASTERN DISTRICT OF MICHIGAN |
| FCA INTERNATIONAL OPERATIONS, LLC, fka Chrysler Group International, LLC; FCA US LLC, fka Chrysler Group, LLC, | ) ) ) ) | |
| Defendants-Appellees. | ) ) | |

BEFORE: MOORE, COOK, and READLER, Circuit Judges.

COOK, Circuit Judge. Union Commercial Services Limited agreed to serve as a nonexclusive distributor of Chrysler, Jeep, and Dodge automobiles in the Republic of Angola. Years later, when Fiat Chrysler Automobiles International Operations, LLC terminated the distributor agreement, Union sued claiming that Chrysler breached the agreement by violating the implied covenant of good faith and fair dealing and tortiously interfered with Union's business relations. The district court dismissed Union's complaint for failure to state a claim and denied its motion to amend as futile. For those same reasons, we AFFIRM.

**I.**

In 2006, Union Commercial Services Limited signed a distributor agreement with Chrysler.[1]  That agreement, governed by Michigan law, made Union a nonexclusive distributor of Chrysler, Jeep, and Dodge automobiles and parts in the Republic of Angola.  According to Union, this business relationship soured in 2009 when Chrysler began working with Grupo Auto-Star, S.A., a competitor organized or controlled by high-ranking members of the Angolan government and military.  In 2011, without a valid distributorship agreement, Auto-Star began selling Chrysler-brand products in Angola, encroaching on Union's distributorship.

Around that same time, despite Auto-Star's entry into the market, Chrysler contacted Union and expressed an intent to have Union continue serving as a distributor in Angola.  One week later, Auto-Star—allegedly acting in concert with Chrysler—sought to acquire an ownership interest in Union.  Union rebuffed that offer, purportedly because the distributor agreement prohibited Union from being owned, in whole or in part, by a government or its agent.

Two years later, Union notified Chrysler of Auto-Star's unauthorized purchase and sale of Chrysler products, and Chrysler denied knowledge of Auto-Star's actions.  Not long after, Chrysler sent Union a notice to terminate the distributor agreement, effective August 31, 2014.  Though Union inquired, Chrysler provided no reason for the termination.  In Union's view, however, the reason was clear: Union's distributor agreement, with its prohibition of government deals, obstructed the rich sales market Chrysler was exploiting with the Angolan officials at Auto-Star.  And without the agreement, Union lost its authorized-distributor status in Angola.

---

[1] Technically, Union entered into this agreement with Chrysler International Corporation. But after Chrysler emerged from bankruptcy in 2009, it assigned the distributor agreement to FCA US (named defendant), which in turn assigned the agreement to FCA International Operations, LLC (named defendant).

Union sued in federal district court, alleging that Chrysler breached the distributor agreement by violating the implied covenant of good faith and fair dealing, tortiously interfered with its business relations, violated the Lanham Act and the civil RICO statute, and should be held liable under the doctrine of promissory estoppel. The defendants moved to dismiss all but one count (for breach of contract) under Civil Rule 12(b)(6), and the district court granted the motion and dismissed the suit.[2] Union then sought to amend its complaint post judgment to replead two dismissed counts and add two others, but the court denied the motion on the ground that amendment would be futile. Union appealed.

## II.

We review de novo a district court's grant of a motion to dismiss for failure to state a claim. *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). For a complaint to survive a motion to dismiss, it must allege enough factual content, accepted as true, "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A complaint containing facts "merely consistent with" a defendant's liability fails to meet this plausibility standard, as it does "not permit the court to infer more than the mere possibility of misconduct." *Id.* at 678–79. And though we accept as true a complaint's well-pleaded allegations, we do not accept as true "a legal conclusion couched as a factual allegation." *Republic Bank & Tr. Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 246 (6th Cir. 2012) (citation omitted).

---

[2] In August 2018, Union agreed to voluntarily dismiss the remaining count with prejudice.

As for a district court's denial of a motion to amend a complaint, we generally review for abuse of discretion. *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000). But where—as here—the district court's decision to deny the motion rests on a legal conclusion that the proposed amendments would be futile, we review the denial de novo. *Id.* Though courts "should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), a motion to amend a complaint should be denied if it would be futile, *Crawford v. Roane*, 53 F.3d 750, 753 (6th Cir. 1993). "A proposed amendment is futile if [it] could not withstand a Rule 12(b)(6) motion to dismiss." *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) (quotation and citation omitted).

## III.

Union appeals the district court's dismissal of its complaint and denial of its motion to amend. Although Union brought a nine-count complaint, it appeals only two of them: Count II, which alleged breach of Article 13.6 of the distributor agreement, and Count IV, which alleged tortious interference with its business relations. With its motion to amend, it sought to add new factual allegations on both these counts and to add two claims against Chrysler for breach of two other articles of the distributor agreement. We start by evaluating the contractual breach claims, considering the allegations contained in the amended complaint, *see Bennett v. MIS Corp.*, 607 F.3d 1076, 1100–01 (6th Cir. 2010), and then analyze the tortious interference claim. On each, we agree with the district court.

## A. Article 13.6

Union first argues that Count II of its complaint plausibly alleged that Chrysler breached Article 13.6 by violating the implied covenant of good faith and fair dealing when it worked with

Auto-Star to bribe Angolan officials and to acquire an ownership interest in Union. But the text of the Articles' subparts obligates Union, not Chrysler.

Article 13.6(1) reads in pertinent part:

[Union] represents and warrants that [Union] will comply with all applicable laws and abide by the requirements of the U.S. Foreign Corrupt Practices Act, U.S. Export Controls, and U.S. Anti-Boycott laws with regard to all activities that are the subject of this Agreement . . . . [Union] and its Authorized Resellers must fully cooperate with CHRYSLER['s] *efforts to comply* with [those laws and regulations].

R. 1-1, PageID 65 (emphasis added). And the next subpart, Article 13.6(2), requires *Union* to warrant that no government official or entity has a substantial financial interest in its distributor agreement. The district court held that the implied good faith covenant claim failed as a matter of law because the plain language of Article 13.6 "does not impose obligations or discretion of performance on" Chrysler. R. 29, PageID 604–05. For that same reason, it held that repleading this count would be futile.

"Michigan does not recognize a [generic, free-standing] claim for breach of an implied covenant of good faith and fair dealing." *FCA US LLC v. Eagle Auto-Mall Corp.*, 702 F. App'x 301, 306 (6th Cir. 2017) (alteration in original) (citation omitted). Rather, the implied covenant attaches "only where one party to the contract makes its performance a matter of its own discretion." *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003) (citations omitted). In other words, the contract must obligate the party to *do* something and leave fulfillment of that something to the party's good faith discretion. *See id.* In the absence of a performance obligation, courts will not imply the covenant. *See Hubbard Chevrolet Co. v. Gen. Motors Corp.*, 873 F.2d 873, 876–77 (5th Cir. 1989) (applying Michigan law); *ParaData Computer Networks, Inc. v. Telebit Corp.*, 830 F. Supp. 1001, 1005–06 (E.D. Mich. 1993).

Union argues that Article 13.6(1)'s "efforts to comply" language makes Chrysler's compliance with the Foreign Corrupt Practices Act discretionary and therefore subject to the implied covenant. But as the district court held, Article 13.6(1) imposes no performance obligation on Chrysler. This "efforts to comply" language suggests that Chrysler may act to comply with the FCPA and other federal laws—and that Union must cooperate in Chrysler's compliance—but does not obligate Chrysler to take any action. In the absence of a performance obligation, or a provision suggesting some discretionary one, Union cannot invoke the covenant to function as it sought with its suit here.

To support its contrary stance, Union points to *Deom v. Walgreen Co.*, 591 F. App'x 313 (6th Cir. 2014). But that case illustrates why this contractual provision does not trigger an obligation to perform in good faith. The agreement there obliged Walgreen to sell the inventory and prescription records from Deom's pharmacies and—here's the key—to pay Deom hefty bonuses if it met certain sales milestones. *Id.* at 314. Deom claimed that Walgreen breached the implied covenant of good faith by performing poorly in its sales efforts so as to prevent triggering bonus payments to Deom from increased sales. *Id.* at 314–15. We held that the contractual language triggered the implied covenant because it imposed on Walgreen a performance obligation (to pay bonuses if it hit the sales targets), and its discretionary performance efforts determined whether it hit those targets. *Id.* at 316–17. Quite differently, the text of Article 13.6 imposes no performance obligation on Chrysler, leaving it no ability to shortchange Union.

Of course, Chrysler must comply with the FCPA and other federal laws. But that's not a contractual obligation owed to Union—it is a statutory obligation that springs from the FCPA itself. Union claims that the obligation's source makes no difference and "does not undermine [the] argument that [Chrysler's] performance under Article 13.6(1) was discretionary." Yet it cites

no cases in which a court implied the covenant where a contract references just one party's compliance with federal law. To be sure, our precedents suggest that the source matters. *See Stephenson*, 328 F.3d at 826 ("Discretion arises when the parties have agreed to defer decision *on a particular term of the contract*.") (emphasis added); *FCA US LLC*, 702 F. App'x at 306 ("Michigan Courts imply a duty of good faith in fulfilling discretion-based *contract terms*.") (emphasis added).

With an alternative argument, Union suggests that the ambiguity of Article 13.6(1)'s text triggers a duty of good faith, untethered to any contractual duty. In making this argument, Union seizes on the district court's initial discussion of the issue in its opinion dismissing the complaint: "Under a generous reading of the provision, the 'efforts to comply' language may suggest that [Chrysler's] performance was within its discretion and therefore that the implied covenant . . . applies." R. 19, PageID 269. But the court correctly disavowed this reading in its later opinion denying Union's motion to amend its complaint, conceding that its "prior discussion of this contractual provision is incorrect." R. 29, PageID 604. And the case it cited to support its initial, later retracted reasoning did not in fact do so. *See ParaData Computer Networks*, 830 F. Supp. at 1105–06 (declining to imply the covenant of good faith and fair dealing). Article 13.6(1)'s language unambiguously fails to impose performance obligations on Chrysler, so Union's implied covenant claim fails as a matter of law. The district court thus correctly concluded that amendment would be futile. *See Crawford*, 53 F.3d at 753.

Union's argument on Article 13.6(2) suffers the same flaw and thus the same fate. That provision requires *Union* to warrant that no government official or entity serves as an owner or investor in Union or has a substantial financial interest in the distributor agreement, and that *Union* will not pay or loan any government official or entity any funds received for goods sold under the

agreement. In Union's view, "by encouraging Auto-Star to acquire an ownership stake in Union[] and then terminating the Agreement when Union refused to violate Article 13.6(2)," Chrysler violated the implied covenant of good faith and fair dealing. Appellant Br. at 38. In effect, Union argues that Chrysler put it in a lose-lose situation. On one hand, it could play along with Chrysler's "scheme . . . for corrupt Angolan interests to acquire an ownership interest in Union," but doing so would render it in violation of Article 13.6(2) (and subject to termination). On the other, Union says, it could comply with Article 13.6(2) and refuse Auto-Star's offer, but risk termination for doing so.

Again though, Union's argument fails to acknowledge the absence of a performance obligation imposed on Chrysler by Article 13.6(2). The text instead speaks to Union's obligations, as Union admits in its own briefing in arguing that Chrysler's actions "prevented or hindered Union from meeting its obligations under Article 13.6(2)." Appellant Br. at 37. Because Article 13.6(2) does not make Chrysler's "performance a matter of its own discretion," *Stephenson*, 328 F.3d at 826, or speak to any obligation Chrysler owes under the contract, Union cannot successfully invoke the implied covenant to create a claim. And as with Article 13.6(1), amendment would be futile.

**B. Articles 8.1 and 13.1**

Union sought to amend its complaint to add two new claims—breach of Articles 8.1 and 13.1—against Chrysler. The district court denied the motion, reasoning that terminating the distributor agreement rendered both provisions unenforceable, as neither appears in Article 14.4(xv), which lists the provisions that "shall survive termination" and "continue to be enforceable obligations." R. 1-1, PageID 70. Union argues that the plain language of Article 14.4(xv) permits post-termination actions for breach of contract when the alleged breach occurred

while the Agreement was in force. Chrysler impliedly agrees by bypassing the district court's reasoning and asking us to affirm on different grounds. *See Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc.*, 323 F.3d 396, 403–04 (6th Cir. 2003) ("We can affirm the district court's judgment on any ground supported by the record.").

First, Article 14.4(xv) does not bar these claims. It reads: "[t]he following provisions of this Agreement shall survive termination of all or part of this Agreement, and shall continue to be enforceable obligations," and then lists over ten provisions, none of which are Article 8.1 or Article 13.1. R. 1-1, PageID 70. This provision plainly lays out the parties' prospective performance obligations; it does not erase obligations that existed pre-termination. Nor does it absolve pre-termination breaches. Thus, this language left Union free to pursue relief for breaches that occurred prior to the agreement's termination, when the contract bound both parties on every contractual provision—whether listed in Article 14.4(xv) or not.

On the merits, however, both claims fail. Union argues that Chrysler breached Article 8.1 by violating the implied covenant of good faith and fair dealing when it failed to complete orders that had been placed with Union. Article 8.1 says:

> [Union] shall place orders for Contract Goods through any Systems and in accordance with any procedures that CHRYSLER may require or implement from time to time. All orders will be subject to terms and conditions (issued from time to time by CHRYSLER) valid at the time of the order.

R. 1-1, PageID 57. Just as with Article 13.6, however, this language imposes no obligation on Chrysler.

Recognizing this, perhaps, at oral argument, Union focused solely on Annex 6—a list of sales conditions referenced and incorporated by a *different* portion of Article 8.1. It did so even though it (admittedly) failed to cite or reference that portion of Annex 6 in either of its briefs. During oral argument, counsel repeatedly represented that Annex 6 imposed on Chrysler a

discretionary obligation to use its best efforts to fill orders, thus triggering the implied covenant. Oral Arg. Audio at 4:14–5:14, 6:03–36, 8:50–9:28. It might—if one reads only the fragment counsel quoted. But here's that snippet (italicized) in context: "*CHRYSLER will use its best efforts to fill accepted orders*, **but shall not be liable to [Union] or any other person for failure to fill accepted orders**." R. 1-1, PageID 81 (emphasis added).

The bolded language dooms Union's claim. Even when a contract obliges a party to perform in its discretion, the implied covenant cannot work "to override express contract terms." *Stephenson*, 328 F.3d at 826. After all, in recognizing this covenant, courts simply seek "to protect the reasonable expectations of the contracting parties," not rewrite the contract. *Id.*; *see Cook v. Little Caesar Enter., Inc.*, 210 F.3d 653, 657 (6th Cir. 2000). Thus, when the parties have "'unmistakably expressed their respective rights,' . . . the covenant does not adhere." *Stephenson*, 328 F.3d at 827 (quoting *Hubbard*, 873 F.2d at 877). Because the contract unmistakably protects Chrysler's failing to fill accepted orders, the implied covenant again cannot aid Union's cause here.

For that same reason, Union fares no better under Article 13.1. It claims that Chrysler breached that provision by violating the implied covenant when it failed to make appropriate efforts to help Union complete potential sales. Specifically, Union alleged that, rather than assist it in completing potential sales, Chrysler opted to process those sales through Auto-Star. Article 13.1 reads:

> [Union] and its Authorized Resellers (through [Union]) shall promptly notify CHRYSLER of any potential offer to sell or sale of Contract Goods that they, for any reasons whatsoever, are unable to make, for CHRYSLER to assist [Union] or its Authorized Resellers or any third party in the conclusion of that potential offer to sell or sale or to make that offer or sale directly.

R. 1-1, PageID 64.

This language allows Chrysler to, in response to Union's call for help (for any reason), complete the offer or sale through *any third party* or do so itself. Consequently, Union's allegation that Chrysler rebuffed its requests for assistance and instead processed sales through Auto-Star falls flat. The contract permits Chrysler to do just that. *See Stephenson*, 328 F.3d at 826–27; *Cook*, 210 F.3d at 657 ("[This covenant] cannot be employed, in interpreting a contract, to override express contract terms."). As a matter of law, Union cannot state a claim for breach of Article 8.1 or Article 13.1, making amendment futile.

### C. Tortious Interference with Business Relations

Union argues that Count IV of its complaint (Count V of its proposed amended complaint) plausibly alleged that Chrysler tortiously interfered with its business relations. It claims that Chrysler did so by encouraging Auto-Star's purchase of an ownership interest in Union, depriving Union of sales by selling vehicles to Auto-Star and ending its business relationship after Union refused to aid in its bribery of Angolan officials. The district court dismissed this claim, reasoning that, among other shortcomings, Union failed to adequately plead that Chrysler intentionally and improperly interfered with its business relations. The court also denied Union's motion to amend this count as futile, pointing to the same deficiencies. We agree with both.

Under Michigan law, to plead tortious interference with its business relations, a plaintiff must allege:

> (1) the existence of a valid business relation or expectancy; (2) that the defendant knew of the relationship or expectancy; (3) that the defendant intentionally interfered by improperly inducing or causing a breach or termination of the relationship or expectancy; and (4) that defendant's improper or unjustified interference resulted in injury to the plaintiff.

*Perceptron, Inc. v. Sensor Adaptive Machs., Inc.*, 221 F.3d 913, 921 n.7 (6th Cir. 2000). On the first element, "[t]he expectancy must be a reasonable likelihood or probability, not mere wishful

thinking." *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 408 (6th Cir. 1999) (citation omitted). The existence of a prior contractual relationship alone does not clear this hurdle. *See id.* But putting aside this issue, Union's pleadings fall short on the third element.

The alleged interference must be both intentional and improper. *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 715–16 (6th Cir. 2018). A plaintiff thus "must allege the intentional doing" of (1) a per se wrongful act or (2) a lawful act done "with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship." *Chrysler Int'l Corp. v. Cherokee Export Co.*, 134 F.3d 738, 745 (6th Cir. 1998). Union chose the second route, so it had to plausibly allege—in addition to purpose—that Chrysler acted with malice and without justification. *Mourad v. Marathon Petroleum Co. LP*, 654 F. App'x 792, 797 (6th Cir. 2016). To do so, a plaintiff "must demonstrate, with specificity, affirmative acts . . . that corroborate the improper motive of the interference." *Saab Auto. AB v. Gen. Motors Co.*, 770 F.3d 436, 442 (6th Cir. 2014) (citation omitted); *Bhan v. Battle Creek Health Sys.*, 579 F. App'x 438, 443–44 (6th Cir. 2014).

Union's argument rests entirely on its view that its bribery allegations require courts to reasonably infer malice. For support, Union relies on *Bonds v. Philips Elecs. N. Am.*, 613 F. App'x 469 (6th Cir. 2015), where we held that a plaintiff could plead malice and lack of justification by alleging that the defendant "did something illegal, unethical or fraudulent." *Id.* at 474 (citation omitted). Thus, the argument goes, because Chrysler's relationship with Auto-Star allegedly violates the FCPA, Union adequately pleaded malice. But we are not required or inclined to follow *Bonds*, an unpublished case that has never been cited by any circuit or district court.

The dissent suggests that we ought to follow the "illegal, unethical or fraudulent" language from *Bonds* because it quotes *Dalley v. Dykema Gossett PLLC*, 788 N.W.2d 679, 696 (Mich. Ct.

App. 2010), "a published decision from the Michigan Court of Appeals, which we should generally treat as authoritative." Dissenting Op. at 6. But we *do* treat *Dalley* as authoritative. And we faithfully apply the rule it states: "To establish that a defendant's conduct lacked justification and showed malice, 'the plaintiff must demonstrate with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference.'" *Dalley*, 788 N.W.2d at 696 (citation omitted). Moreover, even were we to follow *Bonds*, Union does not plausibly plead an FCPA violation by linking Chrysler's actions to the elements of such a violation. *See* 15 U.S.C. § 78dd-2(a).

Analyzing these pleadings instead as our published cases do, Union fails to "demonstrate, with specificity, affirmative acts" corroborating any improper motive. *Saab Auto*, 770 F.3d at 442; *see Clark v. W. Shore Hosp.*, 16 F. App'x 421, 430 (6th Cir. 2001). The contract recognizes Union as a "non-exclusive distributor," meaning Chrysler "[wa]s entitled to sell and service any Contract Goods in [Angola] either directly or indirectly and to appoint other distributors"—such as Auto-Star—to do the same. R. 1-1, PageID 48. That Chrysler continued to sell vehicles through Auto-Star despite Union's insistence (without providing evidence) that Auto-Star (its top competitor) employed Angolan officials does not permit the inference that Chrysler had an improper motive in working with Auto-Star. *See Wausau Underwriters Ins. Co.*, 323 F.3d at 405 (holding that plaintiff's tortious interference claim failed as a matter of law because the contract authorized defendant's conduct). Same goes for its unsupported allegations that certain presidential decrees were issued to enrich the Angolan officials involved with Auto-Star, and its allegations of *other* automobile companies bribing *other* officials in *other countries'* automobile markets. *See Mourad*, 654 F. App'x at 798.

Union failed to plausibly allege that Chrysler acted with malice and without justification, so we need not analyze whether those actions were taken "for the purpose of invading [its] contractual rights or business relationship." *Chrysler Int'l Corp.*, 134 F.3d at 745; *see Mourad*, 654 F. App'x at 798. Because Union failed to plausibly plead that Chrysler improperly interfered with its business relations, the court did not err by dismissing its complaint or denying its motion to amend as futile.

**IV.**

We AFFIRM.

**KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part.**

I concur with the majority's conclusion that the plain language of Article 13.6 of the distributor agreement does not impose any duty—discretionary or otherwise—on Fiat Chrysler Automobiles International Operations LLC ("Chrysler"). Consequently, Union Commercial Services Limited ("Union")'s claim asserting breach of the implied covenant of good faith and fair dealing fails as a matter of law with respect to Article 13.6. *Stephenson v. Allstate Ins.*, 328 F.3d 822, 826 (6th Cir. 2003) (explaining that the covenant is recognized in Michigan "only where one party to the contract makes its performance a matter of its own discretion"); *FCA US LLC v. Eagle Auto-Mall Corp.*, 702 F. App'x 301, 306 (6th Cir. 2017) (noting that although Michigan does not have an independent claim for a breach of the implied covenant of good faith and fair dealing, a breach may arise when a party makes its particular performance under the contract a matter of its own discretion) (citing *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 279–80 (Mich. Ct. App. 2003)). Similarly, because Article 8.1 of the agreement creates an obligation on only Union—to place orders in accordance with Chrysler's terms and conditions—and does not impose a duty on Chrysler to complete those orders, Article 8.1 cannot form the basis of a breach of contract claim; the district court correctly denied Union's motion to amend its complaint to include this claim. I disagree, however, that Union has failed to state a viable claim of breach of the implied covenant of good faith and fair dealing as to Article 13.1. I also believe that Union has stated a plausible claim for tortious interference with a business relationship. Consequently, I concur in part and dissent in part.

Article 13.1 reads:

> [Union] and its Authorized Resellers (through [Union]) shall promptly notify [Chrysler] of any potential offer to sell or sale of Contract Goods that they, for any reasons whatsoever, are unable to make, for [Chrysler] to assist [Union] or its Authorized Resellers or any third party in the conclusion of that potential offer to sell or sale or to make that offer or sale directly.

R. 1-1 (Contract at 20) (Page ID #64). I read this section as indicating that, once Union informs Chrysler that it is unable to complete a certain sale, Chrysler will undertake some action to assist Union, Union's authorized reseller, or "any third party" to complete the sale, or, alternatively, to complete the sale itself. Indeed, the Article spells out this expectation when it explains why Union is required to "promptly notify" Chrysler: so that, as both parties seem to agree, Chrysler will "assist" Union, Union's authorized reseller, a third party, or Chrysler itself to complete the sale. Chrysler's obligations (or lack of obligations) under this Article are, therefore, at best, ambiguous. At this stage of the litigation, we should examine Union's claim using the most favorable interpretation, i.e., that Chrysler *did* have an obligation to assist Union (or another entity) to complete the sales. *See Pinkston-Poling v. Adiva Credit Union*, 227 F. Supp. 3d 848, 854–55 (W.D. Mich. 2016) (refusing to dismiss the plaintiff's implied covenant claim because the contract language was "ambiguous as to the method" that the defendant would use to determine whether the plaintiff had overdrawn her bank account).

Pursuant to this understanding, I believe that Union has plausibly alleged a claim for breach of the implied covenant of good faith and fair dealing under Article 13.1. Once Union notified Chrysler that it was unable to complete a sale, Chrysler was obligated to do one of four things: assist (1) Union, (2) Union's authorized reseller, or (3) a third party to complete the sale, or (4) complete the sale itself. Chrysler's "performance" (i.e., which option it would choose and how it would go about making that decision) thus became "a matter of its own discretion." *Stephenson*,

328 F.3d at 826. Put differently, because Chrysler was "the party in control" with respect to the incomplete sales, it was required to exercise its discretion in choosing one of the four options in good faith. *See Hubbard Chevrolet Co. v. Gen. Motors Corp.*, 873 F.2d 873, 877 n.2 (5th Cir. 1989) (applying Michigan law and noting that when a party has control over a particular contract term, it must act in good faith). And although the implied covenant cannot be applied if doing so would undermine the express terms of a contract, *Stephenson*, 328 F.3d at 826, the distributor agreement is silent as to how and in what contexts Chrysler would choose to fulfill orders through a third party, *id.* (noting that "[d]iscretion also may arise . . . from a lack of clarity or from an omission in the express contract" (quoting *Hubbard*, 873 F.3d at 877 n.2)). Moreover, as this court has recently noted, "[c]ourts have long wrangled with the distinction [between the implied covenant and express terms], asking . . . whether an implied duty of good faith kicks in on a matter of discretion or if express terms control instead." *FCA US LLC*, 702 F. App'x at 306.

As for Union's claims of bad faith, Union contends that Chrysler refused to "assist" Union in completing particular sales and, instead, chose a third party—Auto-Star—in an attempt to destroy Union's business and Union's agreement with Chrysler. *See* R. 22-1 (Am. Compl. ¶¶ 97–98) (Page ID #371–72) (alleging that Chrysler failed "to make appropriate efforts to assist with and/or otherwise complete potential offers" and acted "to prevent, hinder, delay or make more expensive UNION's performance under the Agreement"); *id.* ¶¶ 70–72 (Page ID #361–62) (asserting that from 2010 to the effective termination date in 2014, Chrysler failed to assist Union in completing particular orders and instead processed a bulk order through Auto-Star). Moreover, Union provided sufficient factual allegations which, if taken as true, suggested that (1) Auto-Star was organized and run by government officials with significant police power; (2) Auto-Star had been involved previously in a similar bribery scheme in the past; and (3) Chrysler worked with

Auto-Star even after Union informed them about these issues. *See id.* ¶¶ 31–43 (Page ID #341–47); *id.* ¶¶ 55, 59–63, 73 (Page ID #353–57, 362–63). While Union's bribery allegations certainly require that we make some inferences based on the background of corruption in Angola and Auto-Star's past practices, I believe these inferences are reasonable at this stage of litigation and state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Because Union's amended complaint as to Article 13.1 is not futile—the only basis on which Chrysler urges affirmance—I would remand this claim to the district court to proceed to discovery.

I would also remand Union's tortious interference claim. In order to make out a claim of tortious interference under Michigan law, Union must show four elements:

> (1) the existence of a valid business relation or expectancy; (2) that the defendant knew of the relationship or expectancy; (3) that the defendant intentionally interfered by improperly inducing or causing a breach or termination of the relationship or expectancy; and (4) that defendant's improper or unjustified interference resulted in injury to the plaintiff.

*Perceptron, Inc. v. Sensor Adaptive Machs., Inc.*, 221 F.3d 913, 921 n.7 (6th Cir. 2000). As the majority explains, "[t]he expectancy must be a reasonable likelihood or probability, not mere wishful thinking." *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 408 (6th Cir. 1999) (quoting *Trepel v. Pontiac Osteopathic Hosp.*, 354 N.W.2d 341, 348 (Mich. Ct. App. 1984)). Notably, just because a plaintiff had a previous contractual relationship does not, by itself, establish a business expectancy. *Id.* As noted above, Union's agreement with Chrysler was non-exclusive, and Chrysler was expressly permitted under the terms of the agreement to appoint other distributors. Thus, to the extent Union asserts that it had a valid business expectancy based on its previous sales or its "long presence in the Angolan auto market," its claim fails as a matter of law. Appellant Br. at 53–54; *Grand Rapids Plastics, Inc.*, 188 F.3d at 408 (concluding that the

plaintiff's past work with the defendant did not indicate that the plaintiff could expect to continue working for the defendant in the future). However, Union also contends in its amended complaint that its business expectancy was "based upon specific orders that had been placed by customers in Angola from 2010 through August 31, 2014 but Union was unable to complete and forced to return down payments." R. 22-1 (Am. Compl. ¶ 103) (Page ID #373–74). According to Union, Chrysler interfered with those business relationships, thereby injuring Union. *Id.* at ¶ 105 (Page ID #375). On a motion to dismiss, I believe that these particular contracts and unfulfilled orders indicate "the existence of a valid business relation" that may form the basis of a tortious interference claim. *Perceptron, Inc.*, 221 F.3d at 921 n.7.

The majority primarily relies upon the third element (intentional interference) to resolve Union's appeal. To show intentional interference, Union must show that Chrysler's interference with its business relationship was both intentional—i.e., done for the purpose of interfering with Union's existing sales and orders—and improper. *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 715–16 (6th Cir. 2018). Conduct is "improper" if it is (1) "inherently wrongful," or (2) "is inherently legitimate, but . . . becomes wrongful in the context of the defendant's actions and malice." *Id.* at 716–17. The majority calls into question our previous statement, in an unpublished decision, that malice can be shown if the defendant's actions were "illegal, unethical or fraudulent." *Bonds v. Philips Elecs. N. Am.*, 613 F. App'x 469, 474 (6th Cir. 2015) (quoting *Dalley v. Dykema Gossett PLLC*, 788 N.W.2d 679, 696 (Mich. Ct. App. 2010)). But *Bonds* was quoting a published decision from the Michigan Court of Appeals, which we should generally treat as authoritative. *Auburn*, 898 F.3d at 715; *see Bonds*, 613 F. App'x at 474; *see also Puetz v. Spectrum Health Hosps.*, 919 N.W.2d 439, 453 (Mich. Ct. App. 2018) (quoting *Dalley* for this standard for "malice"). And while the majority explains that it is, nonetheless, following

one part of the standard articulated in *Dalley*, it offers no explanation for its reluctance to endorse the "illegal, unethical or fraudulent" language from *Bonds* and *Dalley*. Given that *Dalley* offers a clearly articulated interpretation of Michigan law from a *Michigan* state court, I will continue to follow both the general rule articulated in *Dalley*—and endorsed by the majority—as well as the additional language articulated in *Bonds* and *Dalley*.

Pursuant to this standard, I believe Union has articulated a plausible claim that Chrysler intentionally and improperly interfered with Union's business relationship and expectancy with customers in Angola. As noted above, Union asserted that Auto-Star was controlled by government officials, had previously engaged in a bribery scheme with another automaker to enrich those same government officials, and that Chrysler chose to fulfill orders with Auto-Star (thereby disrupting particular orders that Union had developed) despite knowing about this fraudulent history and Auto-Star's government ties. Taken as true, these allegations plausibly state a claim for relief. *See Auburn*, 898 F.3d at 718 (explaining that intentional interference can occur if a defendant engages in a wrongful act despite knowing that it will disrupt an individual's business expectancy, even if the defendant's primary motive was not to disrupt the plaintiff's business); *Bonds*, 613 F. App'x at 474.

Consequently, I concur in part and dissent in part.