RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0162p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

AUBURN SALES, INC.,

　　　　　　　　　*Plaintiff-Appellant*,

　　*v.*

CYPROS TRADING & SHIPPING, INC.; JOSEPH KILANI;
FADI KILANI,

　　　　　　　　　*Defendants-Appellees*.

No. 17-2501

---

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 4:14-cv-10922—Linda V. Parker, District Judge.

Decided and Filed: August 6, 2018

Before: MOORE, THAPAR, and NALBANDIAN, Circuit Judges.

---

## COUNSEL

**ON BRIEF:** Eric R. Bryen, ERIC R. BRYEN, P.C., Southfield, Michigan, Mohammed M. Alomari, AZIMUTH LEGAL SERVICES, PLLC, Southfield, Michigan, Stuart J. Snider, LAW OFFICES OF STUART J. SNIDER, Southfield, Michigan, for Appellant. Aaron J. Scheinfield, GOLDSTEIN BERSHAD & FRIED PC, Southfield, Michigan, for Appellees.

---

## OPINION

---

NALBANDIAN, Circuit Judge. This dispute arises from Auburn Sales, Inc.'s role as a middleman selling Chrysler automotive parts. Auburn Sales would buy Chrysler parts and then resell those parts to Cypros Trading & Shipping, Inc., who would then sell those parts to customers in the Middle East. This business arrangement, however, came to an end when the

FBI raided Cypros' warehouse and charged its president, Fadi Kilani, with trafficking in counterfeit goods. Unbeknownst to Auburn Sales, Kilani had been obtaining counterfeit parts, mixing them with the legitimate Chrysler parts received from Auburn Sales, and then selling the comingled parts to customers.

After the fallout, Auburn Sales brought tortious interference claims and a breach of contract claim against Cypros that the district court dismissed on summary judgment. The district court identified two undisputed facts that are fatal to Auburn Sales' claims: (1) Cypros did not specifically intend to interfere with Auburn Sales' relationship with Chrysler, and (2) Cypros and Auburn Sales did not have a written contract. Because we conclude that Michigan tortious interference law requires the specific intent to interfere with a business relationship, and that the Michigan statute of frauds applies here, we AFFIRM.

## I.

Auburn Sales bought automotive parts from Chrysler, and then resold them to Cypros.[1] Cypros then resold the Chrysler parts to customers in the Middle East. The supply chain worked as follows: (1) Automotive Aftermarket Resources, LLC ("AAR") obtained Chrysler parts, (2) that Auburn Sales purchased at a markup, then (3) Cypros would pay an additional premium for the parts from Auburn Sales. Despite this "three-level" system, neither AAR nor Auburn Sales ever took possession of the parts. Instead, Auburn acted as a middleman—getting paid roughly three percent to ensure that Chrysler "drop shipped" the parts directly to Cypros.

This was a successful business model. Auburn Sales' gross sales grew from $1 million in 2010 to more than $3.5 million in 2012. Importantly, this entire business relationship was created only through oral agreements between Chrysler, AAR, Auburn Sales, and Cypros. There was "nothing in writing" between the parties. (Rigby Dep., R. 107-5 at 55.) No partnership agreement; no written contracts.

Instead, Auburn Sales would typically provide Cypros a spreadsheet with quotes for various parts—which would change from time to time. Then, when Cypros required certain

---

[1]Dorne Rigby, the sole owner and president of Auburn Sales, ran the business out of his home in Michigan.

parts, it would send Auburn Sales a purchase order based on the spreadsheet pricing. As Auburn Sales described the arrangement, Cypros "would order parts based on [its] requirements." (*Id.* at 128.) But if Cypros was not happy with a certain price, it did not have an obligation to buy the parts. And if Cypros wanted to end the business relationship altogether, it was free to do so. Nevertheless, from 2010 through early 2013, the parties successfully worked together.

Everything changed in February 2013. Without Auburn Sales' knowledge, Cypros had been counterfeiting automotive parts. Cypros would obtain counterfeit parts, mix them with the legitimate Chrysler parts received from Auburn Sales, and then sell the comingled parts to customers. Cypros accomplished this by placing fake Chrysler labels on parts. The FBI caught wind of the scheme and raided Cypros' New Jersey warehouse on February 19, 2013. Shortly thereafter, Cypros' president, Fadi Kilani, pled guilty to 18 U.S.C. § 371 and § 2320(a)— conspiracy to traffic in counterfeit goods and trafficking in counterfeit goods.

When Chrysler learned of Cypros' counterfeiting, it terminated the supply chain between AAR, Auburn Sales, and Cypros. It remains disputed whether, after the FBI raid, Auburn Sales could have obtained Chrysler parts for other potential customers, if any existed. Regardless, Cypros' counterfeiting, along with the end of the "three-level" supply chain between Chrysler and Cypros, put Auburn Sales out of business for good.[2]

In response, Auburn Sales filed this lawsuit against Cypros, bringing claims under Michigan law for tortious interference with a business relationship, tortious interference with a prospective economic advantage, breach of contract, and negligence. The district court dismissed the negligence claim at the pleadings stage. Auburn Sales does not appeal that decision. Then, after the parties completed discovery, Auburn Sales and Cypros filed cross-motions for summary judgment on the remaining tortious interference claims and breach of contract claim (along with Cypros' counterclaims; not at issue here).

The district court granted summary judgment in favor of Cypros and dismissed Auburn Sales' remaining claims. Regarding the tortious interference claims, the district court explained

---

[2]It is worth noting that, after 2009, Auburn Sales retained only a single client, Cypros, which "represented 100 percent" of Auburn Sales' business. (Rigby Dep., R. 107-5 at 18.)

that Auburn Sales "failed to demonstrate that Defendants sold counterfeit automobile parts for the purpose of causing Chrysler to refuse to sell parts to AAR [and Auburn Sales]."  (Op. & Order Granting Summ. J., R. 123 at 8.)  For the breach of contract claim, the district court determined that the Michigan statute of frauds, found at Mich. Comp. Laws § 440.2201, barred the claim because "[n]either party asserts that there was a written agreement" and Auburn Sales failed to establish that it had an exclusive requirements contract with Cypros.  (*Id.* at 11.) Auburn Sales filed a motion for reconsideration, which the district court denied, and Auburn Sales appealed.

## II.

Summary judgment comes down to two questions.  First, whether Michigan law requires the specific intent to interfere with a business relationship to support a tortious interference claim—even where the act alleged was wrongful in itself.  And second, whether the Michigan statute of frauds invalidates the oral agreement between the parties.  The district court answered both questions in the affirmative.  We now review this decision de novo.  *United Rentals (N. Am.), Inc. v. Keizer*, 355 F.3d 399, 405 (6th Cir. 2004).

In this diversity action, we apply Michigan tort and contract law.  *Maldonado v. Nat'l Acme Co.*, 73 F.3d 642, 644 (6th Cir. 1996).  In doing so, our task is to apply the same law that Michigan state courts would apply.  *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1429 (6th Cir. 1997) (quoting *Kirk v. Hanes Corp. of North Carolina*, 16 F.3d 705, 707 (6th Cir. 1994)).  If the Michigan Supreme Court has spoken on an issue, we are generally bound by that decision.  *Kirk*, 16 F.3d at 707.  And where Michigan appellate courts have spoken in the Supreme Court's absence, "we will normally treat those decisions . . . as authoritative absent a *strong showing* that the [Michigan Supreme Court] would decide the issue differently."  *Id.* (quoting *In re Akron-Cleveland Auto Rental, Inc.*, 921 F.2d 659, 662 (6th Cir. 1990)).  In this latter scenario, we must also look to other available data, such as Restatements, treatises, law reviews, jury instructions, and any majority rule among other states.  *See Monette v. AM-7-7 Baking Co., Ltd.*, 929 F.2d 276, 280 (6th Cir. 1991).

**A.**

Under Michigan law, a tortious interference claim "requires proof of (1) a valid business relationship or expectancy; (2) knowledge of that relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of that relationship; and (4) resulting damage to the plaintiff." *Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 286 (6th Cir. 2010). The district court rejected Auburn Sales' claim on the third element, *i.e.*, whether there was an "intentional" interference by Cypros. Auburn Sales argues that Cypros' intent to commit a wrongful act *per se* satisfies this element. Said another way, Cypros did not accidently counterfeit parts—it purposefully counterfeited parts. But the district court correctly explained that Cypros' intent to counterfeit is not enough. Instead, to support a claim for tortious interference, Auburn Sales must also demonstrate that Cypros intended to interfere with Auburn Sales' relationship with Chrysler.

We have recognized that "[t]he third element requires more than just purposeful or knowing behavior on the part of the defendant." *Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc.*, 323 F.3d 396, 404 (6th Cir. 2003); *Via the Web Designs, LLC v. Beauticontrol Cosmetics, Inc.*, 148 F. App'x 483, 487 (6th Cir. 2005). Instead, "the interference with a business relationship must be improper in addition to being intentional." *Volunteer Energy Servs., Inc. v. Option Energy, LLC*, 579 F. App'x 319, 326 (6th Cir. 2014) (quoting *Formall, Inc. v. Cmty. Nat'l Bank of Pontiac*, 421 N.W.2d 289, 293 (Mich. Ct. App. 1988)); *Weitting v. McFeeters*, 304 N.W.2d 525, 529 (Mich. Ct. App. 1981) ("The interference must be both intentional and improper."). This creates two distinct requirements before Auburn Sales can satisfy the third element: an *intentional* interference and an *improper* interference. *Formall, Inc.*, 421 N.W.2d at 293; Mich. M. Civ. JI 126.01(d)–(e) (requiring a jury to find that the defendant "intentionally interfered" and "improperly interfered" with a business relationship). Contrary to Auburn Sales' argument, a wrongful act *per se*—such as Cypros' counterfeiting—satisfies the latter requirement (committing a crime is surely improper), but not necessarily the former (intending to commit a crime is not the same as intending to interfere with a contract or business relationship). *See Badiee v. Brighton Area Sch.*, 695 N.W.2d 521, 539 (Mich. Ct. App. 2005) ("To the extent that the [conduct] by [defendant] may have constituted an act that was wrongful per se, plaintiffs

presented no evidence that would allow a reasonable jury to conclude that [defendant] intended its [conduct] to induce [a third party] to breach its contracts with [plaintiffs].").

First, "intentional" interference means that the defendant's purpose or desire is to cause an interference with a contract or business relationship. *Knight Enters. v. RPF Oil Co.*, 829 N.W.2d 345, 348–49 (Mich. Ct. App. 2013). Indeed, "[s]ince interference with contractual relations is an intentional tort, it is required that . . . the injured party must show that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct." Restatement (Second) of Torts § 767 cmt. d (1979); *id.* § 766B cmt. d. Michigan appellate courts describe this intent as an "essential element of a claim of tortious interference"—often characterizing a defendant's intentional conduct as having "unjustifiably instigated or induced" a breach of contract. *Knight Enters.*, 829 N.W.2d at 280–81; *Derosia v. Austin*, 321 N.W.2d 760, 762 (Mich. Ct. App. 1982). But regardless of how Michigan courts describe this intent, "[t]he essential thing is the purpose to cause the result. If the actor does not have this purpose, his conduct does not subject him to liability . . . even if it has the unintended effect of deterring the third person from dealing with the other." *Knight Enters.*, 829 N.W.2d at 281 (citations omitted); *Berg v. Munoz*, Nos. 321162, 321645, 2015 WL 4488597, at *2 (Mich. Ct. App. July 23, 2015) (per curiam) ("Not only must an act be 'per se wrongful,' but the plaintiff must also demonstrate that the act was done with the intention of inducing a breach of the contract.").

Second, "improper" interference means conduct that is either "(1) wrongful *per se*; or (2) lawful, but done with malice and unjustified in law." *Warrior Sports, Inc.*, 623 F.3d at 287; *Clark v. West Shore Hosp.*, 16 F. App'x 421, 430 (6th Cir. 2001) (quoting *Feldman v. Green*, 360 N.W.2d 881, 891 (Mich. Ct. App. 1984)). "A 'per se wrongful act' is an act that is inherently wrongful or one that is never justified under any circumstances.'" *Volunteer Energy Servs., Inc.*, 579 F. App'x at 326 (quoting *Formall, Inc.*, 421 N.W.2d at 293). "On the other hand, 'if the defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference.'" *Berg*, 2015 WL 4488597, at *2 (quoting *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 812 (Mich. Ct. App. 2002)). Said another way, the "improper" nature of an interference is shown by proving

either (1) conduct that is inherently wrongful, or (2) conduct that is inherently legitimate, but which becomes wrongful in the context of the defendant's actions and malice.[3]  But either way, "[t]he interference must be both intentional and improper."[4]  *Weitting*, 304 N.W.2d at 529; *Badiee*, 695 N.W.2d at 539 (requiring a showing of an "intent to induce" a breach of contract for both a wrongful act *per se* and a lawful act committed with malice).

The Michigan Supreme Court recognizes the difference between *intentional* interference and *improper* interference—through the adoption of Michigan's Model Civil Jury Instructions. *See, e.g.*, Mich. M. Civ. JI 126.01(d)–(e).  Before a jury can find a defendant liable for tortious interference, the jury must find that the defendant both (1) "intentionally interfered with the business relationship or expectancy," and (2) "improperly interfered with the business relationship or expectancy."  *Id.*; Mich. M. Civ. JI 125.01(c)–(d).  Indeed, Michigan's model instructions provide separate definitions for intentional interference, Mich. M. Civ. JI 125.03 and 126.03, and improper interference, Mich. M. Civ. JI 125.04 and 126.04.  These definitions are consistent with the definitions provided by Michigan appellate courts and the Restatement.  Thus, if Cypros did not intend to interfere with Auburn Sales' relationship with Chrysler, then Defendants' otherwise improper conduct cannot create liability for tortious interference.

To be sure, at least under the Restatement, there is interplay between "intentional" interference and "improper" interference.  This is especially true when considering the defendant's motive, which can potentially overlap the two requirements:

> The relation of the factor of motive to that of the nature of the actor's conduct is an illustration of the interplay between factors in reaching a determination of

---

[3]When determining whether otherwise lawful conduct becomes wrongful and thus improper, a court can consider several factors, such as the nature of the conduct, the actor's motive, the parties' competing interests, social interests and policy considerations, proximate cause, and the relationship between the parties.  Restatement (Second) of Torts § 767 (1979); *Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451, 463 (Mich. Ct. App. 1989); *Tata Consultancy Services, a Div. of Tata Sons Ltd. v. Sys. Int'l, Inc.*, 31 F.3d 416, 423–25 (6th Cir. 1994).

[4]In contrast, Auburn Sales would collapse these two requirements into one by relying on the "last antecedent" rule—arguing that "[t]his appeal turns on the lack of a comma." (Appellant's Br. at 8.)  While we do not dismiss the helpfulness of this grammatical rule, Auburn Sales concedes that the rule "is not an absolute and can assuredly be overcome by other indicia of meaning."  (*Id.* at 16 (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)).)  This is especially true where, as here, we are not interpreting the plain language of a statute.  For this common law tort, we instead look to Michigan appellate courts and other available data to determine Michigan law, all of which point in the same direction.

whether the actor's conduct was improper. If the conduct is independently wrongful—as, for example, if it is illegal because it is in restraint of trade or if it is tortious toward the third person whose conduct is influenced—the desire to interfere with the other's contractual relations may be less essential to a holding that the interference is improper. On the other hand, if the means used by the actor are innocent or less blameworthy, the desire to accomplish the interference may be more essential to a holding that the interference is improper.

Restatement (Second) of Torts § 767 cmt. d (1979). In other words, as the improper conduct becomes more egregious, the plaintiff's burden to demonstrate the defendant's intent to interfere may inversely lessen. This ultimately depends on the knowledge of the defendant.

For example, "if there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional." *Id.* This is because if a defendant "knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *Id* § 8A cmt. b; Mich. M. Civ. JI 126.03 (same). But either way, there must be some evidence of the defendant's intent to interfere—even if that evidence is the defendant's knowledge (and decision to ignore) that his conduct would inevitably interfere with the plaintiff's contract or business relationship.

Here, however, Auburn Sales does not raise this issue. Nor does Auburn Sales argue that Cypros knew, or was substantially certain, that Chrysler would terminate its relationship with Auburn Sales because it was counterfeiting.[5] Auburn Sales thus forfeited these arguments. *See Bickel v. Korean Air Lines Co.*, 96 F.3d 151, 153 (6th Cir. 1996) (quoting *Priddy v. Edelman*, 883 F.2d 438, 446 (6th Cir. 1989)). Rather, Auburn Sales relies solely on the argument that it need not prove any intent to interfere as long as it shows an act that is wrongful *per se*—here, counterfeiting. But because that argument is inconsistent with Michigan law, we agree with the district court's rejection of Auburn Sales' tortious interference claims.

---

[5]Auburn Sales also failed to raise this argument in the district court. (Pl.'s Mot. Summ. J., R. 107 at 7 (relying only on Defendants' admissions of counterfeiting and a wrongful act *per se*).)

**B.**

Under Michigan's equivalent of the Uniform Commercial Code and Statute of Frauds, "a contract for the sale of goods for the price of $1,000.00 or more is not enforceable . . . unless there is a writing sufficient to indicate that a contract for sale has been made between the parties."  Mich. Comp. Laws § 440.2201(1).  The writing must include three requirements to validate the sales agreement:  "First, it must evidence a contract for the sale of goods; second, it must be 'signed' . . . ; and third, it must specify the quantity."  *Id.* cmt. 1.

Auburn Sales admits that it agreed to sell goods to Cypros—and that the sales "via this agreement" exceeded millions of dollars. (Compl., R. 1 ¶¶ 13, 27–30.)  Thus, Auburn Sales can enforce the agreement only if there is a sufficient writing under Mich. Comp. Laws § 440.2201(1).  But Auburn Sales admits that there was no written contract with Cypros.  This should end our inquiry.

Instead, Auburn Sales urges that a writing is not required because the agreement with Cypros was a "requirements" contract.  According to Auburn Sales, a requirements contract does not need a writing to "specify the quantity" because there is no precise quantity.  For example, Cypros did not agree to buy a specific number of Chrysler parts from Auburn Sales—it agreed to generally buy all the parts needed to fill its customer orders.  But even if Auburn Sales' oral agreement with Cypros was a requirements contract, the result does not change. Michigan law still requires a writing to enforce a requirements contract for the sale of goods.[6]

---

[6]Auburn Sales' arguments to the contrary are unavailing.  First, Auburn Sales cites *Miltimore Sales, Inc. v. International Rectifier, Inc.*, 119 F. App'x 697 (6th Cir. 2004), for the proposition that an "oral contract with an indefinite end point does not implicate the statute [of frauds]."  (Reply Br. at 8 n.9.)  *Miltimore Sales*, however, concerned an agreement regarding sales commissions and has no bearing on the applicability of the statute of frauds to contracts for the sale of goods.  *See* 119 F. App'x at 699–700.  Next, Auburn Sales argues that a party's partial performance of an oral contract removes that contract from the statute of frauds.  In certain circumstances, partial performance is an exception to the writing requirement of the statute of frauds, *see* Mich. Comp. Laws § 440.2201(3)(c), but those circumstances are not present here.  The "partial performance" exception to the statute of frauds comes into play only "[w]ith respect to goods for which payment has been made and accepted or that have been received and accepted."  *Id.*; *see also id.* cmt. 2 ("'Partial performance' as a substitute for the required memorandum can validate the contract *only* for the goods which have been accepted or for which payment has been made and accepted." (emphasis added)).  As Auburn Sales' case does not concern goods that have already been paid for and accepted, or received and accepted, the statute of frauds applies and bars Auburn Sales' claim.

The Michigan Supreme Court explained that "[a] requirements or output term of a contract, although general in language, nonetheless is, *if stated in the writing*, specific as to the quantity, and in compliance with [Mich. Comp. Laws § 440.2201]." *Lorenz Supply Co. v. Am. Standard, Inc.*, 358 N.W.2d 845, 847 (Mich. 1984) (emphasis original). For example, Michigan appellate courts allow imprecise quantity terms to satisfy the statute of frauds in requirements contracts, such as a "blanket order" for units, an agreement to supply "all concrete" needed, or "all wood sawable." *Great N. Packaging, Inc. v. Gen. Tire & Rubber Co.*, 399 N.W.2d 408, 412–13 (Mich. Ct. App. 1986) (citing *In re Estate of Frost*, 344 N.W.2d 331, 333–34 (Mich. Ct. App. 1983)). "Once a quantity term is found to exist in the agreement, the agreement need not fail because the quantity term is not precise." *Id.* at 413. In other words, the term describing the party's requirements *is* the quantity term.[7] Thus, irrespective of the imprecise nature of a quantity term, Michigan law still instructs parties to include a "requirements" quantity term in a writing.[8]

But here, Auburn Sales admits that there is no writing whatsoever—not even one that contains a general quantity term. This might have been a different case if Cypros signed a written agreement to "purchase all Chrysler parts as needed," or if the parties agreed that this was a "distribution" agreement rather than a sale of goods agreement. *See AB Prod. v. Dampney Co.*, 908 F.2d 972 (6th Cir. 1990) (unpublished table decision). Instead, because it is undisputed that there is no written agreement between the parties, Auburn Sales' claim for breach of the sales contract fails under the Michigan statute of frauds.

---

[7]This is consistent with Mich. Comp. Laws § 440.2306 cmt. 2, which explains that "a contract for output or requirements is not too indefinite since it is held to mean the actual good faith output or requirements of the particular party." Thus, this comment to Mich. Comp. Laws § 440.2306 does not alleviate the need for a writing, but explains that a requirements quantity term satisfies the mandate in Mich. Comp. Laws § 440.2201 to "specify a quantity" in writing.

[8]The district court reached the correct result that Mich. Comp. Laws § 440.2201 bars the breach of contact claim. However, we pivot slightly in our analysis. The district court determined that Auburn Sales failed to establish that the agreement was a requirements contract—thus, Mich. Comp. Laws § 440.2201 applied. On appeal, Auburn Sales argues at length that disputed issues of fact remain and a jury should decide whether its agreement with Cypros was indeed a requirements contract. But even if Auburn Sales is correct, it does not change the result. Michigan law requires a contract for the sale of goods to be in writing—even if the contract is a requirements contract. *Lorenz Supply*, 358 N.W.2d at 847. We can affirm the district court's decision under our analysis. *See Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 569 (6th Cir. 2001) ("[W]e may affirm [a grant of summary judgment] on any grounds supported by the record, even if different from the grounds relied on by the district court.").

**III.**

Although Cypros' counterfeiting scheme is regrettable, it cannot create a *per se* tortious interference claim.  And situations like this remind parties of the importance of written contracts.  For these reasons, we affirm the district court's grant of summary judgment dismissing Auburn Sales' tortious interference claims and breach of contract claim.