*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TOTAL QUALITY, INC.,

　　　　　Plaintiff/Counterdefendant-Appellee,

v

TERRY L. FEWLESS and NATHAN FEWLESS,

　　　　　Defendants-Appellants,

and

QUALITY LIFE SCIENCE LOGISTICS, LLC,

　　　　　Defendant/Counterplaintiff-Appellant.

FOR PUBLICATION
July 9, 2020
9:00 a.m.

No. 346409
Mecosta Circuit Court
LC No. 15-023149-CK

Before: K.F. KELLY, P.J., and FORT HOOD and SWARTZLE, JJ.

FORT HOOD, J.

　　　　Defendants, Terry L. Fewless (Terry) and Nathan Fewless (Nathan), and defendant/counterplaintiff, Quality Life Science Logistics, LLC (QLSL),[1] appeal as of right the trial court's October 30, 2018 judgment in favor of plaintiff/counterdefendant, Total Quality, Inc. (TQI), on its claims of breach of contract and tortious interference with a business relationship. Defendants also challenge an earlier denial of their motion for summary disposition.[2] Because genuine issues of material fact existed, the trial court properly denied defendants' motion for summary disposition. Moreover, the trial court's disputed factual findings following the bench trial were not clearly erroneous. We therefore affirm.

---

[1] When appropriate, "defendants" will refer to all three defendants collectively.

[2] This Court previously denied defendants' interlocutory application for leave to appeal the denial of the motion for summary disposition with respect to the claims. *Total Quality, Inc v Fewless*, unpublished order of the Court of Appeals, entered September 15, 2017 (Docket No. 337982).

# I. FACTUAL BACKGROUND

This is an action arising from alleged breaches of a nonsolicitation clause contained in employment agreements. The parties do not dispute the following facts as recounted in the trial court's opinion and order adjudicating cross-motions for summary disposition filed in this matter. The opinion provides:

TQI was founded in 1992 by Terry Fewless. It is a transportation logistics company that provides truckload, less-than-truckload, and cold-chain logistics services to pharmaceutical, biopharmaceutical, and generic drug manufacturers, distributors, and wholesalers in the United States, Canada, and Mexico. Through a series of transactions, Terry Fewless, Nathan Fewless, and Kris Fewless sold their interest in TQI to Thayer Group in 2008 and thereafter purchased a minority share of stock in TQI, and Terry and Nathan each signed an Employment Agreement that enabled them to continue working at TQI. Both of these agreements contained a paragraph related to "non-solicitation." The specific language of these clauses is laid out in more detail below, but they generally forbade Terry and Nathan from inducing any TQI employee to leave the company, from hiring any person who had been a TQI employee at any time in the preceding 12 months, or from soliciting or servicing any TQI customer, supplier, distributor, or other business relation in an attempt to induce that business relation to cease doing business with TQI or otherwise interfere with that business relation's relationship with TQI. The non-solicitation clause remained in effect during the "Employment Period" and for two years after that Period's expiration.

Terry and Nathan continued to work at TQI after they signed the employment agreements. The "Initial Term[s]" of these agreements ran from March 7, 2008, until March 7, 2013, and the agreements automatically renewed for one-year terms after the expiration of the Initial Term—each one-year term constituting a "Renewal Term." In 2013, near the time of the expiration of the Initial Term, Forward Air, Inc., purchased TQI for $66 million. Each Employment Agreement entered a Renewal Term, and Terry and Nathan continued to work for TQI under their employment agreements. On January 31, 2014, however, Terry sent notice to TQI of his intent not to renew his Employment Agreement. On February 3, 2014, TQI sent notice to Terry and Nathan indicating that it intended not to renew their employment agreements. Consequently, the employment agreements expired on March 8, 2014. Thereafter, Terry and Nathan continued as at-will employees.

Terry resigned his position at TQI on October 31, 2014, and Nathan resigned on April 10, 2015. Thereafter, on February 9, 2015, QLSL was formed by Terry and Kris Fewless. Terry stated that it had no purpose at the time and that he did not plan to have anything to do with QLSL. After Nathan retired from TQI in April 2015, an operating agreement was executed regarding QLSL. This June 2015 operating agreement reflected that Kris and Nathan each possessed a 50% ownership interest in QLSL. While Terry ostensibly had no active role in QLSL after its initial formation, Nathan and Terry attended a healthcare-industry

conference in October 2015, which also included as attendees representatives from TQI customers, such as Pfizer.

Between May and August of 2015, QLSL began to involve other personnel in its operations. Three of these individuals—Amy Hebert, Joel Dykens, and Steve Milam—had been affiliated with TQI in some fashion before and during 2015. Ms. Hebert was an employee of TQI, and she resigned from her position there to take time off, get married, relax, and plan to possibly work at an RV park owned by Kris and Nathan. After matters with the RV park were delayed, she became involved with QLSL's operations around May or June 2015. Mr. Dykens dealt with sales, finances, and reporting at TQI. He became involved with QLSL in August 2015. Mr. Milam was an independent contractor for TQI, and he had a client relationship with Actavis in which he helped place Actavis cold-storage transportation business [sic]. Actavis has done business with both TQI and QLSL. Notably, Mr. Milam contacted Terry Fewless in a June 26, 2015, email and asked whether Mr. Milam should pursue business with Par Pharmaceutical Companies, Inc., or whether he should wait until July 1, 2015, when he officially ended his relationship with TQI. All three individuals were affiliated with QLSL as independent contractors, but Hebert and Dykens became W-2 employees in June 2016. Ms. Hebert is the Senior Director of Customer Operations for QLSL, and Mr. Dykens is the Vice-President of Business Development for QLSL.

QLSL services three customers that have previously been customers of TQI—Pfizer, Perrigo, and Actavis. Actavis is a "client" of Mr. Milam and became a customer of QLSL through him. Perrigo became a customer of QLSL through Ms. Hebert when she contacted Perrigo and subsequently submitted rates to Perrigo on behalf of QLSL, Pfizer became a customer of QLSL in a more indirect manner. A representative of Pfizer emailed Terry about a request for proposal[3] ("RFP"). Terry forwarded the email to Nathan and Ms. Hebert. QLSL then submitted a bid for work with Pfizer. Ms. Hebert testified that she recognized some of the lanes that were awarded to QLSL from her previous work with TQI. But for these three customers, there is no argument that QLSL obtained other customers of TQI in a manner that violated the non-solicitation clause.

TQI brought this action, eventually filing an amended complaint against defendants, alleging in relevant part that Terry and Nathan breached the nonsolicitation clause of their employment agreements by hiring Herbert, Dykens, and Milam, and by soliciting or servicing TQI's customers during the employment period covered by the nonsolicitation clause. It also alleged a claim of tortious interference with business relations against all defendants.[4] The parties moved for

---

[3] Nathan testified that "RFP" stands for "request for price" and is essentially a request for a bid.

[4] QLSL filed a countercomplaint alleging a claim of business defamation against plaintiff. The trial court's grant of summary disposition of the countercomplaint in favor of TQI is not at issue in this appeal.

summary disposition, which the Court considered pursuant to MCR 2.116(C)(10) (no genuine issue of material fact).

The pertinent provisions of the agreements state:

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made as of March 7, 2008 . . . .

* * *

1. Employment. The Company [TQI] shall employ the Executive, and the Executive hereby accepts employment with [TQI], upon the terms and conditions set forth in this Agreement for the period beginning on the date hereof (the "Effective Date") and ending as provided in Section 4 hereof (the "Employment Period").

* * *

4. Employment Period; Termination; Severance Pay.

(a) The Employment Period shall commence on the Effective Date and shall continue (i) until and including the fifth anniversary of the Effective Date (the "Initial Term"), unless earlier terminated pursuant to the Executive's resignation or death or the Executive's inability to perform the essential duties, responsibilities, and functions of the Executive's position with [TQI] as a result of any mental or physical disability or incapacity . . . . or (ii) until the Board determines in its sole discretion that termination of the Executive's employment with or without cause is in the best interests of [TQI]. After the expiration of the Initial Term, this Agreement shall automatically renew for one-year periods (each a "Renewal Term") (with the first such period commencing on March 7, 2013) unless either party gives written notice of its intention not to allow the Agreement to automatically renew . . . .

* * *

7. Non-Solicitation. During the Employment period and continuing for two years thereafter, the Executive shall not directly or indirectly through another Person, (i) directly or indirectly induce or attempt to induce any employee of [TQI] to leave the employ of [TQI], or in any way interfere with the relationship between [TQI] and any such employee (provided, that any general solicitation through magazines, trade journals, newspapers, or other publications shall not constitute a violation of this clause (i) [sic]); (ii) hire any Person who was an employee of [TQI] at any time during the twelve-month period immediately prior to the date on which such hiring would take place; or (iii) directly or indirectly call on, solicit, or service any customer, supplier, distributor, or other business relation of [TQI] in order to induce or attempt to induce such Person to cease doing business with [TQI], or in any way directly or indirectly interfere with the relationship between any such

customer, supplier, distributor, or other business relation and [TQI] (including making any disparaging statements about any member of [TQI]).

As relevant to this appeal, the trial court considered defendants' motion for summary disposition as to TQI's claims that Nathan violated the third provision of the nonsolicitation clause when, acting through QLSL, he serviced Perrigo, Actavis, and Pfizer and hired Milam as an independent contractor, and that Terry violated the third provision of the nonsolicitation clause by forming QLSL, by receiving and forwarding to Nathan and Hebert an August 4, 2015 e-mail from Pfizer with respect to an RFP, and by involving himself in Milam's hiring. Defendants argued that they did not violate the third provision of the nonsolicitation clause and that TQI attempted to apply it as if it were a noncompete clause rather than a nonsolicitation clause. They also argued that the reference to inducing a person "to cease doing business with" TQI required a cessation of all of that person's business with TQI, not just part of it.

In reading the third provision of the nonsolicitation clause, the court found that the clause is violated only "where the calling on, soliciting, or servicing of a business relation of TQI occurs for the purpose of inducing that business relation to cease doing business with TQI." It found that "[t]he intent of the provision is to prohibit Nathan and Terry from actively disrupting TQI's relationship with its customers so that those customers would take the business it does with TQI elsewhere, whether a percentage of the business or the business in its entirety." The court determined that a genuine issue of material fact existed with respect to whether Nathan, operating through QLSL, violated the third provision of the nonsolicitation clause with regard to Pfizer, Perrigo, and Actavis and whether Terry, through Milam, violated the provision as to Actavis.

Defendants also moved for summary disposition as to TQI's claim of tortious interference with business relationship claim. They based this argument on their position that there was no violation of the nonsolicitation clause. In light of its findings of the existence of a question of fact regarding the claims that defendants breached the nonsolicitation clause, the court denied defendants' motion for summary disposition in this regard.

The case proceeded to a bench trial on TQI's claims that Terry and Nathan had improperly solicited business in violation of their employment agreements by presenting bids for Pfizer's[5] shipping lanes in response to the RFP from Pfizer in August 2015, and that in doing so they tortiously interfered with TQI's existing business relationship with Pfizer.

Following the presentation of proofs, the trial court issued a detailed ruling from the bench. The trial court's lengthy ruling provides a thorough and accurate recitation of the testimony and the exhibits admitted at trial. In sum, the trial court found that Terry and Nathan had violated the "solicit or service" provisions of their employment agreements. In so holding, the trial court found that Terry and Nathan had taken affirmative steps to procure the business from Pfizer by setting up the competing business, by going through the Pfizer qualification process, and by preparing

---

[5] Because the trial court found after the bench trial that TQI had not proven that Terry and Nathan had improperly solicited business in violation of their employment agreements with respect to Actavis and Perrigo, we discuss the claims only as they relate to Pfizer.

and submitting a bid for lanes that they knew were being serviced by TQI. The court determined that TQI suffered damages from the breach of contract in the amount of $550,663.

In a written opinion dated September 25, 2018, after consideration of posttrial briefing, the trial court found that QLSL had tortiously interfered with TQI's business relationship with Pfizer, but determined that its interference did not cause TQI to incur any damages beyond the $550,663 previously awarded on TQI's breach-of-contract claim against Terry and Nathan. On October 30, 2018, the trial court entered a final judgment, awarding damages in the amount of $550,663 against all defendants, jointly and severally, in accordance with its findings stated on the record at the conclusion of the bench trial on August 10, 2018, and its additional findings stated in its September 25, 2018 opinion and order.

## II. SUMMARY DISPOSITION

We first address defendants' contention that the trial court erred when it denied their motion for summary disposition with respect to both the breach of contract claim and the tortious interference with a business relationship claim.

This Court reviews de novo a trial court's grant or denial of a motion for summary disposition. *Ormsby v Capital Welding, Inc*, 471 Mich 45, 52; 684 NW2d 320 (2004). A motion brought pursuant to MCR 2.116(C)(10) tests the factual sufficiency of a claim. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160, 934 NW2d 665 (2019). "When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id*. A court may only grant the motion when "there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10); see also *El-Khalil*, 504 Mich at 160. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "Courts are liberal in finding a factual dispute sufficient to withstand summary disposition." *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018) (citation omitted). To the extent that resolution of this issue requires interpretation of the parties' employment contract, questions of contract interpretation are also reviewed de novo. *White v Taylor Distrib Co, Inc*, 289 Mich App 731, 734; 798 NW2d 354 (2010).

### A. BREACH OF CONTRACT

Defendants contend that the trial court erred by finding that issues of material fact existed with respect to TQI's claim that Terry and Nathan violated the third provision of the nonsolicitation clause. We disagree.

The third provision of the nonsolicitation agreement provides that Terry and Nathan may not

> directly or indirectly call on, solicit, or service any customer, supplier, distributor, or other business relation of [TQI] in order to induce or attempt to induce such Person to cease doing business with [TQI], or in any way directly or indirectly interfere with the relationship between any such customer, supplier, distributor, or

other business relation and [TQI] (including making any disparaging statements about any member of [TQI]).

Defendants contend that unlike a noncompete clause, this nonsolicitation clause did not preclude them from responding to requests initiated by customers. They assert that it prohibited only solicitation that was engaged in with the intention of inducing or attempting to induce a person to cease doing business with TQI or interfere with the relationship between that person/customer and TQI. According to defendants, TQI and the trial court erroneously construed the provision as a noncompete clause by finding that a violation of the nonsolicitation clause could occur based on a response to an unsolicited customer-initiated request if the customer had a business relationship with TQI and the response resulted in any loss of TQI's business. Defendants maintain that the contractual language defined the prohibited solicitation of customers in narrow terms and did not contain any language prohibiting Terry and Nathan from conducting business in competition with TQI without any intent to induce its customers to cease doing business with TQI or interfere with its customer relations. They maintain that "the evidence . . . did not provide any legally sufficient support for a finding that Terry or Nathan had engaged in any such conduct falling within the legitimate scope of the contractual language and its intended purpose."

A party claiming breach of contract must show "(1) that there was a contract, (2) that the other party breached the contract, and (3) that the party asserting breach of contract suffered damages as a result of the breach." *Doe v Henry Ford Health Sys*, 308 Mich App 592, 601; 865 NW2d 915 (2014). The primary goal of contract construction is to give effect to the parties' intent. *Jay Chevrolet, Inc v Dedvukaj*, 310 Mich App 733, 735; 874 NW2d 146 (2015). To achieve this goal, the Court must read the contract language, giving it its plain and ordinary meaning. *Innovation Ventures v Liquid Mfg*, 499 Mich 491, 507; 885 NW2d 861 (2016). Where the language of the contract is unambiguous, the contract must be interpreted and enforced as written. *Id*. Where the contract language is subject to multiple interpretations, it is considered ambiguous. *Farmers Ins Exch v Kurzmann*, 257 Mich App 412, 418; 668 NW2d 199 (2003). "Ambiguities in a contract generally raise questions of fact for the jury; however, if a contract must be construed according to its terms alone, it is the court's duty to interpret the language." *Id*.

First, defendants argue that a reasonable trier of fact could not find evidence sufficient to establish that Terry and Nathan breached the employment agreement by calling on, soliciting, or servicing TQI's customers. They contend that they did not "call on" or "solicit" TQI's customers because they did not initiate the contact with Pfizer but, rather, responded to the RFP initiated by Pfizer.

The third provision of the employment agreement does not define the term "solicit." This Court may consult a dictionary to ascertain the plain and ordinary meaning of the term. *Epps v 4 Quarters Restoration LLC*, 498 Mich 518, 529; 872 NW2d 412 (2015). The *Merriam-Webster's Collegiate Dictionary* (11th ed.) defines the term "solicit" as "to make petition to." Alternatively, the American Heritage Dictionary of the English Language (5th ed.) defines "solicit" as "[t]o seek to obtain by persuasion, entreaty, or formal application." The record evidence substantiates that Terry and Nathan "made a petition to" Pfizer, TQI's customer, to award QLSL business when they responded to Pfizer's RFP with a bid to service the lanes. Alternatively, the record evidence substantiates that Terry and Nathan sought to be awarded Pfizer business by "formal application" when they responded to Pfizer's RFP with a bid to service the lanes. It appears irrelevant that

Pfizer sent the RFP to QLSL and prompted QLSL's response, because the nonsolicitation clause prohibits Terry and Nathan from soliciting TQI's customers, which they did by affirmative action by submitting a bid to service Pfizer's lanes, at least when the evidence is viewed in the light most favorable to TQI.

Relying on foreign authority, defendants argue that no violation of a nonsolicitation agreement occurs when the customer initiates the contact, and that merely accepting business from a customer does not constitute a violation of a nonsolicitation clause. Defendants rely on *Slicex, Inc v Aeroflex Colorado Springs, Inc*, unpublished opinion of the United States District Court for the Central District of Utah, issued July 25, 2006 (Case No. 2:04-CV-615-TS), p 4. The issue in that case was whether a nonsolicitation clause in a consulting contract had been violated by hiring the plaintiff's employees. *Id.* at 2. The court found that in order for the defendant to solicit or take away the plaintiff's employees, the defendant must have taken a specific, directed action to hire away one of the plaintiff's employees. *Id*. at 7. Defendants also cite *Akron Pest Control v Radar Exterminating Co, Inc*, 216 Ga App 495; 455 SE2d 601 (1996). In that case, Sellers, a stockholder in Active Pest Control, which subsequently merged into Radar Exterminating Group, entered into a nondisclosure/nonsolicitation agreement with Radar in which he agreed "not to solicit, either directly or indirectly any current or past customers or current employees" of Radar. *Id*. at 496. Sellers thereafter established his own company, Akron Pest Control. It was undisputed that Akron did business with former Radar clients and it was also undisputed that Sellers in no way sought out former Radar customers. *Id*. Radar brought suit alleging that Sellers was guilty of breach of contract. Radar took "the position that the contract language could be understood by the parties to mean that Sellers would refuse and, in fact, turn away pest control business if contacted by any customers [subject to the agreement] and refuse to hire and, in fact, turn away employees of [Radar] as of the date of the stock sale if they came to him looking for employment." *Id*. The court refused such a broad reading of the nonsolicitation clause. The court held that in order for Sellers to violate the nonsolicitation agreement it would require some affirmative action on his part. "Merely *accepting* business that Sellers was forbidden otherwise to seek out for a period of time does not in any sense constitute a solicitation of that business." *Id*. at 497.

Neither of these cases appear to be supportive of defendants' argument in this case under the facts of this case, where defendants did not merely accept business from Pfizer but, rather, responded to an RFP from Pfizer and submitted a bid for lanes that defendants knew to be lanes that TQI was servicing before the RFP. QLSL would not have been awarded any business, however, had it not submitted bids in response to Pfizer's RFP. TQI cites *FCE Benefits Administrators, Inc v George Washington Univ*, 209 F Supp 2d 232 (DC, 2003). In that case, the defendant, an insurance agent, had signed an "Agent Fee Agreement" with the plaintiff, a corporation that designed and administered health insurance benefit plans. *Id*. at 234. The plaintiff alleged that the defendant breached the agreement, which prohibited the defendant from diverting, soliciting, or disclosing information about any of the plaintiff's existing customers, by taking away a client from the plaintiff. *Id*. Though it was undisputed that the clients had initiated the contact with the defendant, the court held that the defendant violated the nonsolicitation clause because she assumed an active role in the client's decision-making process. *Id.* at 239-240.

Even if this Court were to determine that merely accepting business from a customer who initiates contact does not constitute solicitation, the evidence in this case indicates that Terry and Nathan assumed an active role in Pfizer's decision-making process by submitting bids in response

to the RFP. The evidence was sufficient to create an issue of fact with respect to whether Terry and Nathan solicited TQI's customer, Pfizer.

Defendants argue that if the response to the RFP was a form of solicitation, there was no basis for a reasonable trier of fact to conclude that the response was made in order to induce or attempt to induce Pfizer to cease doing business with TQI or to interfere with TQI's relationship with Pfizer. The trial court addressed this argument as follows:

> Defendants also argue that the phrase "cease doing business" must mean *all* business between TQI and the customer. For example, Defendants state that, "The RFP [to QLSL] did not relate to all of Pfizer's business; rather it related only to a limited number of lanes that Pfizer sought to open up to competition among its various carriers." However, a plan reading of the phrase "cease doing business" suggests that Nathan and Terry were barred from undermining TQI's business relationship with its customers, no matter whether the target was a small or large portion of the business TQI and its customers did together. The intent of the provision is to provide Nathan and Terry from actively disrupting TQI's relationship with its customers so that those customers would take the business it does with TQI elsewhere, whether a percentage of the business or the business in its entirety.
>
> In light of the above reasoning, it is clear that there is a genuine issue of material fact as to whether Nathan and Terry violated the third provision of the nonsolicitation clause.

Defendants' argument that there was no evidence to support the trial court's finding is undermined in part by a statement made by Nathan in his affidavit. Nathan stated that the August 2015 RFP sent to Terry by Pfizer was sent to a number of companies "because Pfizer was unsatisfied with the services that [TQI] was providing with regard to other lanes." This statement suggests that defendants saw an opportunity to obtain this particular business in the hope of obtaining future business from Pfizer with the result of drawing business away from TQI and interfering with TQI's relationship with Pfizer. The evidence supports the finding by the trial court that there existed a genuine issue of material fact as to whether Terry and Nathan responded to the RFP in an attempt to induce Pfizer to cease doing business with TQI or to interfere with TQI's relationship with Pfizer.

Defendants' final argument—that the third provision of the nonsolicitation agreement runs afoul of MCL 445.774a(1)—is misplaced. MCL 445.774a(1), which concerns agreements not to compete, provides as follows: "An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business." The provision at issue in this case is a nonsolicitation agreement, and defendants have not cited authority in support of the contention that nonsolicitation agreements are subject to MCL 445.774a(1). The provision at issue does not prevent defendants from engaging in "a particular line of business" as defendants suggest. Indeed, there is no dispute that QLSL may compete with TQI in the general business of brokering carriers. TQI concedes

that defendants are able to compete with TQI as long as they "stay away from TQI's customers, employees, and business relationship" with those customers and employees. Rather, the nonsolicitation provision at issue prevents defendants from soliciting or servicing "any customer, supplier, distributor, or other business relation of TQI in order to induce or attempt to induce such the person to cease doing business with [TQI], or in any way directly or indirectly interfere with the relationship between any such customer, supplier, distributor, or other business relation and [TQI]."

Even assuming that the nonsolicitation clause is subject to MCL 445.774a(1), "noncompetition agreements are . . . only enforceable to the extent they are reasonable." *Coates v Bastian Bros*, *Inc*, 276 Mich App 498, 506; 741 NW2d 539 (2007). The reasonableness requirement is embodied in MCL 445.774a(1), which is the codification of Michigan common-law rules regarding the enforceability of noncompetition agreements. *St Clair Med, PC v Borgiel*, 270 Mich App 260, 265-266; 715 NW2d 914 (2006). Accordingly,

> [a] restrictive covenant must protect an employer's reasonable competitive business interests, but its protection in terms of duration, geographical scope, and the type of employment or line of business must be reasonable. Additionally, a restrictive covenant must be reasonable as between the parties, and it must not be specially injurious to the public.

> Because the prohibition on all competition is in restraint of trade, an employer's business interest justifying a restrictive covenant must be greater than merely preventing competition. To be reasonable in relation to an employer's competitive business interest, a restrictive covenant must protect against the employee's gaining some unfair advantage in competition with the employer, but not prohibit the employee from using general knowledge or skill. [*Coates*, 276 Mich App at 506-507, quoting *St Clair Med*, 270 Mich App at 266 (quotation marks and block quote omitted).]

Defendants argue that TQI did not have a reasonable competitive business interest. However, employers have legitimate business interests in restricting former employees from soliciting their customers. The scope of the activity prohibition is reasonable and allows defendants to compete with TQI as long as they do not solicit TQI's customers, employees, and business relationships. Additionally, the two-year duration of the provision was reasonable. Defendants' statutory argument is without merit.

## B. TORTIOUS INTERFERENCE

Defendants next contend that TQI's claim for tortious interference with a business relationship, which was dependent upon Terry and Nathan's alleged violation of the nonsolicitation clause, should have been dismissed because Terry and Nathan did not violate the nonsolicitation clause. We disagree.

This is the same argument that defendants presented in the trial court. The trial court noted that defendants' argument was that "TQI's claim 'is based entirely on TQI's erroneous contention that Terry and Nathan somehow violated the non-solicitation clause.' They conclude, 'Because

-10-

there was no violation of the non-solicitation clause, there was no improper interference with any TQI contract.' " The court also noted that "[t]here is little in the way of argument on either side regarding this claim—except that the claim is inextricably tied to the breach of contract claim." The court opined as follows:

> In this case, the tortious interference with a business relationship claim relies on the outcome of the breach of contract claim. If a reasonable finder of fact concludes that Nathan, through QLSL, at least attempted to induce Pfizer, Perrigo, or Actavis to cease doing business with TQI, then the reasonable finder of fact could also conclude that there was tortious interference with a business relationship. Likewise, if the fact-finder determines that Terry at least attempted to induce Milan and Actavis to cease doing business with TQI, then that fact-finder could also determine that there was tortious interference with a business relationship. Therefore, the motions for summary disposition regarding the tortious interference with a business relationship claim are denied to the extent of the circumstances related to the breach of contract scenarios noted in this paragraph. As to all other scenarios, the motion for summary disposition regarding tortious interference is granted.

In light of our conclusion as to the breach of contract issue, that the court properly determined that a question of fact existed regarding the violation of the third provision of the nonsolicitation clause, we also conclude that the trial court properly concluded that a genuine issue of material fact existed with respect to the tortious interference with a business relationship claim.

## III. BENCH TRIAL

We next address defendants' contention that the trial court's findings after trial were clearly erroneous. "This Court reviews a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo. A finding is clearly erroneous where, after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made." *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003) (citations omitted).

## A. BREACH OF CONTRACT

Defendants' argument with respect to the trial court's findings on the breach of contract issue mirrors their argument with respect to summary disposition. They assert that the evidence at trial did not support a finding that Terry and Nathan violated the third provision of the nonsolicitation clause by responding to Pfizer's RFP and obtaining a portion of the Pfizer business that was put up for bid. We disagree.

After thoroughly summarizing the testimony presented at trial, the trial court opined, in relevant part:

> I recited some facts. I think it really boils down to does submitting a bid in response to an RFP constitute solicitation on the behalf of Nathan and/or Terry Fewless.

\* \* \*

So, does it require here that I rule the plain reading of the contract language, paragraph 7, that an affirmative first step must be taken by Terry and Nathan Fewless to approach Pfizer to have that constitute solicitation. Or, if they actively respond to an opportunity they've learned of through Pfizer, could that also constitute solicitation when they've put forth an effort to bid on business and try and secure business. And I think the testimony shows that at least some of the lanes they were aware, not all, but they were aware that at least some of the lanes were lanes that had previously been serviced by TQI.

I find here that the non-solicitation, paragraph 7, has been violated by Nathan and Terry Fewless. And I find it because I do find the act of preparing the bid, working to secure the business, getting certified and approved by Pfizer, responding to the general notice that there's an RFP out there, I think that's sufficient to constitute solicitation. I think the accumulated behavior is that affirmative strong step to try and secure business that may have been the business—we have to figure that out still—of TQI.

So I do find that paragraph 7 was violated in that regard as to the Pfizer business.

The court also noted:

I am not unmindful . . . that a traditional non-solicitation clause might be easily viewed as one where that defendant goes out and tries to grab that business affirmatively; does something to start the process. And I didn't find that distinctly to be the case here. There was some inferences about how maybe Mr. Fewless [sic] got his address or whatever, but not enough to suggest they had really taken the first step, the defendants. But, I thought they took a first step to get their name back to this general RFP request that it looked like they were really anxious or soliciting the business, and that that seems to run afoul of that general meaning of that section. And I do believe in reading the contract as its written. It just seems to me that's still soliciting if you put a bunch of paperwork together and you get certified and you work hard to get some business from somebody. That's contrary to the interest of the plaintiff.

But what I'm recognizing . . . is that it could be a close call, so maybe that's your appeal issue for what it's worth. But I'm not ignorant of that fact. But it just seems like it fits slightly on the side of solicitation and I treat it as such.

After reiterating that Nathan and Terry "violated the non-solicitation provision by looking to secure some of these lanes," the trial court thoroughly discussed the manner in which Pfizer awarded the lanes included in the RFP, and then determined that Nathan and Terry's violation interfered with TQI's business relationship with Pfizer. The court found that despite Pfizer's opening up bidding for TQI lanes to other logistics companies, QLSL took lanes of business that otherwise likely would have gone back to TQI.

-12-

For the same reasons that the trial court did not err in denying summary disposition with respect to this issue, we are not left with a definite and firm conviction that a mistake was made at trial. The trial court's finding that Terry and Nathan breached their employment agreements by submitting a response to an RFP from TQI's customer, Pfizer, and its finding that by doing so Terry and Nathan interfered with TQI's relationship with Pfizer, were not clearly erroneous.

## B. TORTIOUS INTERFERENCE

We lastly conclude that the trial court did not clearly err in finding that defendants knew that their action of submitting a response to the RFP was substantially certain to interfere with the business relationship between TQI and Pfizer.

The elements of tortious interference with a business relationship or expectancy are (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the defendant, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the plaintiff. *Cedroni Ass'n, Inc v Tomblinson, Harburn Assoc, Architects & Planners, Inc*, 492 Mich 40, 45; 821 NW2d 1 (2012). Defendants' sole argument is that the trial court's finding with respect to the third element—that QLSL "knew that its actions [in responding to the RFP] were substantially certain to interfere with the business relationship or expectancy between [TQI] and Pfizer" and "chose to ignore that substantial certainty"—was clearly erroneous.

The trial court found that "[b]ased upon the [c]ourt's factual finding at trial regarding the elements of breach of contract, or more particularly the breach of the non-solicitation agreement by Nathan and Terry Fewless, the elements of the tortious interference claim against [QLSL], except for intent, are readily satisfied." With respect to the element of intentional interference— the element that defendants challenge on appeal—the trial court stated in its opinion:

> Part d [the element of intentional interference], above, considers the intent of [QLSL] when it solicited Pfizer business performed by [TQI] and that likely would continue with [TQI] in the absence of solicitation. [QLSL] offered *Auburn Sales, Inc v Cypros Trading Shipping, Inc*, 898 F3d 710 (CA 6, 2018), in support of its argument that at trial [TQI] did not establish the element of intent by a preponderance of the evidence.

> The definition section of the standard jury instruction for tortious interference with a business relationship, M Civ JI 126.03(b), defines "intent" to include when "defendant acted knowing that his or her conduct was certain or substantially certain to cause interference with plaintiff's business relationship or expectancy." *Auburn*, 898 F3d at 717 cites this instruction.

> * * *

> Consistent with that meaning, [QLSL] at a minimum knew that its actions were substantially certain to interfere with the business relationship or expectancy between [QLSL] and Pfizer. Bidding on Pfizer lanes previously serviced by [TQI] in breach of the non-solicitation agreement between Quality Life's CEO and owner Nathan Fewless and Pfizer left little doubt that if the bids were successful if would

-13-

cost [TQI] business it otherwise expected to receive from Pfizer. So whether or not [QLSL] set out to expressly or directly tortiously interfere is immaterial in that it knew that its intended behavior made interference with [TQI's] business relationship with Pfizer substantially certain, and it chose to ignore that substantial certainty.

Defendants' sole argument is that the finding of "substantial certainty" was clearly erroneous because there were two bidders in addition to TQI and QLSL and there was no assurance that TQI would have been awarded the business had QLSL not submitted a response. Defendants do not expand on this argument. Nonetheless, the relevant inquiry focuses on defendants' intent, not on whether TQI was "assured" to be awarded the business. By submitting bids on all lanes in response to the RFP, QLSL intended for Pfizer to award it at least some, if not all, of the lanes. The trial court's finding that defendants knew that their action of submitting a response to the RFP was substantially certain to interfere with the business relationship between TQI and Pfizer was not clearly erroneous.

Affirmed.


/s/ Karen M. Fort Hood
/s/ Kirsten Frank Kelly
/s/ Brock A. Swartzle